**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY, P. J., and SELF, J.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**August 11, 2017**

# In the Court of Appeals of Georgia

A17A1050. COTMAN v. THE STATE.

A17A1051. WILLIAMSON v. THE STATE.

DILLARD, Chief Judge.

In 2010, Governor Sonny Perdue ordered a special investigation into the nearly decade-long suspicions that administrators, principals, and teachers in the Atlanta Public Schools System ("APS") had engaged in widespread cheating on standardized tests used to assess the progress of elementary and middle-school students in Georgia. After the conclusion of that investigation, the State indicted thirty-five APS administrators, principals, and teachers for crimes ranging from altering State documents, providing false statements to law-enforcement officials, and conspiring to violate the Georgia Racketeer Influenced and Corrupt Organizations ("RICO") Act. Ultimately, the State jointly tried 12 defendants, including School Reform Team

Executive Director Tamara Cotman and elementary school teacher Angela Williamson. Then, following a six-month trial, a jury convicted 11 of the defendants, specifically convicting Cotman and Williamson of conspiring to violate RICO and also convicting Williamson on two counts of making false writings and two counts of false swearing.

In separate appeals, which we have consolidated for review at the parties' request, Cotman and Williamson contend that the trial court erred by instructing the jury that it could find that they violated *either* of the two subsections of the RICO statute despite the indictment charging the violation in the conjunctive, failing to find that this instruction created a fatal variance, and sentencing the defendants under the RICO statute rather than the general conspiracy statute. Cotman further contends that the trial court erred in denying her plea in bar of double jeopardy. Nevertheless, for the reasons set forth *infra*, we affirm the convictions of both Cotman and Williamson.

*APS, Academic Targets, and Adequate Yearly Progress*

Viewed in the light most favorable to the jury's verdict,[1] the record shows that on July 1, 1999, Dr. Beverly Hall became the superintendent of Atlanta Public Schools. Dr. Hall's administrative staff included Sharon Pitts (who worked as Hall's

---

[1] *See, e.g.*, *Powell v. State*, 310 Ga. App. 144, 144 (712 SE2d 139) (2011).

2

Chief of Staff), Colinda Howard (who oversaw the Office of Internal Resolution ("OIR") and was tasked with investigating employee misconduct), Millicent Few (who worked as the APS Director of Human Resources), and Veleter Mazyck (legal counsel). Additionally, under Dr. Hall, APS was organized into four School Reform Teams ("SRT"), which were specific geographic regions of metropolitan Atlanta and more specifically the elementary and middle schools within those regions. During Dr. Hall's tenure, Tamara Cotman served as the Executive Director of SRT-4, and as with all of the directors, her responsibilities included providing supervisory guidance to the principals and schools within her region.

Immediately after Dr. Hall was hired as superintendent, she began working with professional education consultants to devise a means by which to measure and improve APS students' academic progress. Then, after those consultations, Dr. Hall established a system requiring students at all APS elementary and middle schools to be tested so as to determine the numbers of students who "met academic expectations" and the numbers who "exceeded" such expectations. Importantly, every school in APS was required to meet a "Target" number—*i.e.*, a percentage of students in both of these categories, and Dr. Hall mandated that these Target numbers be raised every year.

3

In January 2002, around the same time that Dr. Hall began implementing her Targets system for APS, the federal government enacted the No Child Left Behind Act of 2001. Under this legislation, the State of Georgia received federal funding to assist low-income school districts and, *inter alia,* was required to report whether its schools were making what was termed "Adequate Yearly Progress" ("AYP"), which was measured by students' performance on the annually administered Criterion-Referenced Competency Test ("CRCT"). Schools failing to achieve AYP received additional federal funding to assist teachers and struggling students.

Although inextricably linked, the Targets established by Dr. Hall were separate from the requirements for AYP and, in fact, were more stringent. But in addition to the stated objective of being a means by which to measure students' academic progress during Dr. Hall's tenure, Targets quickly became the primary means by which to measure teachers and administrators' performance. For instance, the SRT Executive Directors, including Cotman, received salary raises if their schools made Targets and AYP, and employees at individual schools would similarly receive bonuses if their schools achieved their Target numbers. Indeed, Dr. Hall's own employment contracts also provided significant salary bonuses that were contingent upon APS achieving its academic progress Targets.

4

The failure to make Targets, however, often resulted in negative consequences for APS employees. Specifically, teachers and administrators whose students and schools failed to meet Targets could be demoted (resulting in a decreased salary), transferred (also resulting in a decreased salary), or placed on what was termed a Professional Development Plan ("PDP"), which was often a precursor to the termination of one's employment contract with APS. Unsurprisingly, the pressure placed on administrators and teachers to make Targets became intense and was exacerbated by the fact that many at APS believed the Targets to be patently unreasonable. Despite such concerns, Dr. Hall was uncompromising in her stance that Targets be met, informing one principal upon his termination for failing to meet Targets, despite his school's academic progress, that she "had no time for incremental gains."

*Evidence of Cheating Throughout APS*

Within a few years of Dr. Hall's hiring as APS superintendent, large improvements in APS students' test scores led to suspicions that such gains may have been the result of cheating. Initially, little in the way of concrete evidence demonstrated widespread abuses. But in March 2005, a teacher at Parks Middle School informed the Executive Director of SRT-2 that the newly hired principal was

5

explicitly promoting cheating on the CRCT. And when it appeared that the Director would not be taking any action, the teacher sent anonymous letters directly to Dr. Hall to inform her of what was taking place at the school. Shortly thereafter, the SRT-2 Director attended a staff meeting at Parks Middle School, acknowledged the anonymous letters, but ordered that they cease, stating that the principal had the backing of Dr. Hall and would not be leaving. Nevertheless, APS directed Reginald Dukes, a private investigator who had worked with APS in the past, to investigate the allegations. On June 30, 2006, after interviewing teachers, including the teacher who first reported the issue, Dukes submitted a report to Dr. Hall, in which he concluded that cheating had occurred at Parks Middle School. But Dr. Hall took no action as a result of the report, and APS never hired Dukes again.

In July 2008, a summer re-test of the CRCT for students from several different APS schools was conducted at Deerwood Academy. During that re-test, several teachers collaborated to erase students' incorrect answers and change them to the correct ones, and as a result, Deerwood met its AYP target for that year. A few months later, in October 2008, Kathleen Mathers became the executive director of the Governor's Office of Student Achievement ("GOSA"), an agency tasked with providing data analysis on various education programs in the State. And in reviewing

6

data related to the CRCT, Mathers noticed abnormally dramatic increases in student achievement within APS, including at Deerwood Academy, in comparison to scores statewide. In addition, her office and the Assessment Division of the Georgia Department of Education were receiving numerous anonymous complaints from parents and teachers of cheating at APS schools. Around this same time, the Atlanta Journal Constitution ("AJC") published an article regarding the unusual gains in test scores within APS, in which they quoted an expert in the field of psychometrics,[2] who stated that the gains were as "extraordinary as a snowstorm in July" and warranted further investigation.

Based on her own suspicions and the AJC's article, Mathers decided to conduct a statewide erasure analysis on all of the 2008 CRCT summer re-tests. In essence, such an analysis entailed scanning the tests with an Optical Mark Recognition machine that determines if answer bubbles, in addition to the one ultimately filled, also contain residual amounts of pencil graphite, indicating that the bubble had been filled but later erased. The analysis was completed in April 2009, and based on the results, which showed that 11 Deerwood students had significantly high instances of

---

[2] Psychometrics is a field of study concerned primarily with developing and evaluating the effectiveness of educational testing.

erasing a wrong answer and changing it to a correct one (*i.e.*, wrong-to-right erasures), as well as an additional investigation, GOSA concluded that cheating had occurred at Deerwood Academy during the 2008 summer re-test. Thereafter, Mathers attempted to schedule a meeting with Dr. Hall to discuss the erasure analysis, but after being unable to do so, she had a copy of the report hand-delivered to Dr. Hall at a local conference the superintendent was attending.

On June 23, 2009, Mathers met with APS OIR director Howard and Penn Payne, an external investigator, who APS hired to look into the cheating allegations, and informed them of GOSA's findings. Following this meeting, on July 6, 2009, Dr. Hall emailed Mathers to inform her that APS and Payne had completed investigations and determined that there was no evidence cheating had occurred at Deerwood Academy. Then, on August 21, 2009, APS released Payne's report regarding Deerwood, which found no evidence of cheating. Ultimately, however, Mathers learned that the statements in Dr. Hall's email and the conclusions in the Payne report were false. In fact, APS had not conducted an internal investigation and, in a draft report that Dr. Hall ordered Few and Howard to destroy, Payne actually concluded that cheating probably occurred at Deerwood during the 2008 summer re-test.

8

Unsatisfied with APS and Dr. Hall's response to her concerns, in the autumn of 2009, Mathers decided to conduct a statewide erasure analysis for the 2009 CRCT administered the previous spring. The analysis was conducted by CTB/McGraw Hill, and on January 22, 2010, it released its report, which included the number of wrong-to-right erasures in each school in the state (and in each classroom of every school), and flagged those schools with the highest numbers of wrong-to-right erasures. The report flagged 58 APS schools as having moderate to severe wrong-to-right erasures. Consequently, in February 2010, GOSA ordered APS, as well as other flagged districts, to conduct an internal investigation into the suspected cheating and report its findings by April of that same year. In light of this directive, Dr. Hall assembled a Blue Ribbon Commission ("BRC") to conduct APS's investigation. The BRC then hired KPMG and tasked its investigators with interviewing APS teachers and administrators. But additionally, despite Mathers cautioning APS against questioning the erasure analysis, the BRC hired a private company to conduct another such analysis. And on August 2, 2010, based on the second erasure analysis and KPMG investigators' interviews of APS teachers and administrators, the BRC submitted its report to GOSA, in which it found no evidence of cheating. Unconvinced, Mathers rejected the BRC's findings.

9

*The Governor's Special Investigation into APS*

Following her rejection of the BRC's report, on August 26, 2010, Mathers requested that Governor Perdue order a special independent investigation into the suspected cheating on the CRCT within APS. Governor Perdue agreed and appointed former Attorney General Michael Bowers, former DeKalb County District Attorney Robert Wilson, and investigator Richard Hyde, with assistance from the Georgia Bureau of Investigation, to investigate the matter. Subsequently, the special investigators went to CBT/McGraw Hill's headquarters in Indianapolis, Indiana, to replicate and, therefore, verify GOSA's previous erasure analyses of the 2008 and 2009 CRCTs. As a result, the investigators determined that the previous erasure analyses may have even under-reported the numbers of wrong-to-right erasures on those two tests. In addition, from October 2010 through May 2011, the special investigators and GBI agents conducted over 2,100 interviews of APS teachers and administrators employed throughout 55 schools. And despite APS leadership being uncooperative and many teachers lying during interviews, eventually 82 teachers and administrators admitted to cheating during the 2009 CRCT, with many further admitting that such cheating had been occurring at numerous APS schools for years.

10

On June 30, 2011, the special investigators released their report, concluding that widespread cheating on the 2009 CRCT had occurred within 44 APS schools. Specifically, the special investigators' report found that teachers and administrators had cheated by numerous means, including violating testing security and storage protocols, changing students' answers after the tests were completed, providing students with correct answers while the tests were being administered, and copying the tests and reviewing the correct answers with students prior to the tests being administered. In addition, the special investigators found that testing irregularities were witnessed but not reported as required by testing protocols, and that testing coordinators and administrators signed documents stating that protocols were followed despite being well aware that those averments were not true. The report also found that the reasons provided by teachers and administrators for why they cheated were myriad. Many witnesses explained that if they made Targets and AYP (which they claimed was difficult to do without cheating), they received bonus money and their schools' achievement would be publicly recognized at APS's annual year-end convocation. But many more witnesses stated that they engaged in cheating or failed to report cheating they witnessed because of APS's culture of obsession with Targets

11

and AYP and of punishing anyone who spoke out with demotions or terminations of employment.

*Tamara Cotman and Cheating within SRT-4*

As previously noted, from 2004 through 2011, Cotman served as the Executive Director of SRT-4 within APS. In August 2007, Patricia Wells, the principal of Ben Carson Middle School, who began working there the previous year, became concerned that many of her students' academic performance did not correlate with their elementary school CRCT scores and, therefore, she asked some of the students to explain the discrepancy. The students responded that their elementary school teachers had provided them with the answers to the CRCT. And because Ben Carson Middle School was within SRT-4, Principal Wells immediately reported the information to Cotman. But Cotman did not report Wells's allegations to OIR and took no action to investigate them. Then, at the end of month, Cotman gave Wells a negative performance evaluation. By October 2007, Cotman placed Wells on a PDP, and in December 2007, Cotman informed Wells that for the next school year she could either accept a demotion to an assistant principal position at a different school or resign. Wells opted to resign.

12

Similarly, in the spring of 2007, just before the CRCT, the principal of Scott Elementary called a staff meeting, during which the teachers were shown methods for cheating on the upcoming test. Tonette Hunter, a paraprofessional at the school, was alarmed by the discussion and, thus, reported the incident directly to Cotman. To Hunter's surprise, Cotman advised her that the issue was none of her business and that she needed to cease discussing it if she wanted to keep her job. A few days before the end of that school year, Cotman terminated Hunter's employment.

That same school year, Michael Milstead was hired as the principal for Harper-Archer Middle School, and immediately, he began noticing a significant discrepancy between many of his students' poor academic performance and their high 5th grade CRCT scores. Milstead alerted Cotman regarding this discrepancy, but she did not investigate and, in fact, informed Milstead that other principals did not appreciate him raising this issue. In addition, Cotman continued to place a significant emphasis on making AYP and placed Milstead on PDPs on two occasions when his school failed to meet the goals. Later, Cotman told Milstead that he should resign, as she would not be renewing his contract, and Milstead did so in 2009. Just prior to his resignation, Milstead observed that the previous year's CRCT scores were significantly higher than the year before, but he had no faith that those scores were legitimate.

13

In yet another similar incident, Monica Hooker began working as a teacher at Best Academy in its inaugural year (2007-2008), and she was given the added responsibility of collecting testing data for the school. Hooker reported to her principal that the students' academic performance did not correlate with their high CRCT scores from the previous spring. Cotman responded to Hooker's report by demoting her and transferring her to another school, complaining to Hooker that she was not playing for the right team. Given Cotman's constant focus on test scores, Hooker understood her demotion to be a result of her refusal to cheat on the CRCT.

In the spring of 2008, D. C., a third-grade student at Blalock Elementary (a school also within SRT-4), told his mother that his teacher had given students the answers during the recent CRCT. The mother, who had recently heard a similar story from her young niece, then reported her son's revelation to the school's principal and Cotman. But rather than investigating or reporting the complaint to OIR, Cotman told the mother that her son was lying. Unpersuaded, the mother filed a complaint with APS's central office. Subsequently, an investigator with OIR interviewed D. C. and his mother, but no further action was taken. And on September 12, 2008, the mother received a letter from Dr. Hall, stating that there was no evidence that cheating had occurred at Blalock Elementary.

14

In the spring of 2009, Mary Gordon, a teacher at Turner Middle School, received the answers to the Common Assessment test and students' answer sheets. But Gordon refused to cheat on the test, and, in fact, reported the incident to Cotman, who refused to investigate the matter. Instead, Cotman advised Gordon: "They just do things like that at Turner." Later, Gordon was placed on a PDP, and she eventually resigned due to the stress caused by her work environment.

Caitlin Sims was the principal of Grove Park Elementary during the 2008-2009 school year, and she noted that under Cotman, Targets were the number one priority. Indeed, Cotman constantly ranked schools against each other and used PDPs as punishment. Sims also recalled an instance when Cotman gave the principals empty frames and told them to put a picture in the frame of something important, such as a mortgage or car note as motivation for improving their schools' CRCT scores. After the BRC began its investigation into the cheating allegations, Cotman asked Sims to explain to the commission how the school's education strategies had resulted in the gains, but Sims refused, explaining that she was uncomfortable doing so based on the fact that the high number of wrong-to-right erasures at Grove Park were difficult to reconcile. Shortly after Sims's refusal, Cotman placed her on a PDP.

15

*Angela Williamson and Cheating at Dobbs Elementary*

Angela Williamson was a well-respected 4th grade teacher at Dobbs Elementary, which is within SRT-2. As with most other schools within APS, the pressure to meet Targets at Dobbs was tremendous, and the principal would stress at every staff meeting that Targets had to be met by any means necessary. In fact, the principal was so adamant about meeting these goals that she would tell Dobbs's teachers that they should find new professions if they were unable to make Targets.

In 2007, during CRCT testing, the assistant principal brought the completed tests into a teachers' meeting at the end of the day and instructed the teachers to "clean up" the tests. When a few of the newer teachers looked confused as to the meaning of this comment, Williamson explained: "If you want to keep your jobs, you better clean these tests up." Williamson then demonstrated how to use the high achieving students' tests as a guide for changing the answers on the lower achieving students' tests.

Several of Williamson's former students revealed that during the CRCT testing, she would walk around the classroom and provide students with the correct answers if they appeared to be answering questions incorrectly. All of these students further stated that Williamson admonished them not to tell anyone, often stating that "what

happened in her class, stayed in her class." Nevertheless, a few of the students told other teachers about Williamson's actions. In addition, a paraprofessional, who proctored the CRCT in Williamson's class, observed her providing students with answers, thus corroborating the students' accounts of such instances. Moreover, GOSA's erasure analyses in both 2008 and 2009 showed that numerous students in Williamson's class had statistically significant high wrong-to-right erasures.

*Procedural Background*

On March 29, 2013, following the conclusion of the Governor's Special Investigation, the State charged Dr. Hall, Cotman, Williamson, and 32 other APS administrators, principals, and teachers, via an indictment filed in the Superior Court of Fulton County, with numerous crimes relating to the widespread cheating within APS, including conspiring to violate the Georgia RICO Act, providing false statements to law-enforcement officials, theft by taking, influencing witnesses, and false swearing. More specifically, the State charged Cotman with one count of conspiring to violate the RICO Act and one count of influencing a witness, and it charged Williamson with one count of conspiring to violate the RICO Act, two counts of providing false statements, and two counts of false swearing.

17

On May 14, 2013, Cotman filed a special demurrer seeking to quash Count 4 of the indictment, which charged her with the offense of influencing a witness. Specifically, Cotman argued that the allegation that she "did intimidate [principal] Jimmye Hawkins" in an effort to hinder communication with the GBI was too vague. Shortly thereafter, the State re-indicted Cotman solely on the charge of influencing a witness, and then it filed a motion requesting that the trial court enter an order of nolle prosequi as to Count 4 in the original indictment and join the new indictment with the original for trial purposes. But Cotman filed a response objecting to joinder and a motion demanding a speedy trial on the new indictment.

Subsequently, Cotman was tried separately on the sole charge in the new indictment of influencing a witness, and on September 12, 2013, at the conclusion of that trial, the jury found her not guilty. One month later, Cotman filed a plea in bar of former jeopardy, arguing that the State was barred from trying her on either the RICO or influencing-a-witness charges in the original indictment. The State filed a response, and following a hearing, the trial court denied Cotman's plea in bar as to the RICO charge but granted it as to the influencing-a-witness charge. Cotman appealed the denial of her plea in bar on the RICO charge, but this Court affirmed the trial court's ruling, concluding "that Cotman, having opposed the State's invitation

18

to join the two indictments for a single trial, faces subsequent prosecution because of her own election and thereby waived the protections against subsequent prosecutions afforded by OCGA § 16-1-8 (b)."[3]

On September 29, 2014, after months of discovery, pre-trial motions, and 21 defendants electing to plead guilty, the trial for 12 of the indicted defendants, including Cotman and Williamson, commenced.[4] During the six-month trial, numerous witnesses, including 14 of the defendants who had opted to plead guilty, testified as to the evidence discussed *supra*. The State rested its case on February 11, 2015, and, thereafter, the defendants presented their respective cases over the course of the following six weeks. Finally, on April 1, 2015, after nearly a week of deliberation, the jury found Cotman and Williamson guilty on the charge of conspiracy to violate the RICO Act and further found Williamson guilty on the two charges of providing false statements and the two charges of false swearing. Both Cotman and Williamson waived motions for new trial, and these appeals follow.

---

[3] *Cotman v. State*, 328 Ga. App. 822, 826 (1) (762 SE2d 824) (2014).

[4] By the time the trial commenced, Dr. Hall was gravely ill and, therefore, was not tried with the aforementioned defendants.

19

*Analysis*

1. Cotman and Williamson contend that the trial court erred by instructing the jury that it could convict the defendants if it found that they violated *either* subsection (a) *or* subsection (b) of the RICO Act despite the indictment charging the defendants with conspiring or endeavoring to violate subsections (a) *and* (b), conjunctively. We disagree that this instruction constituted error.

At the outset, we note that a trial court's duty in delivering charges to the jury is to "tailor those charges not only to the indictment but also adjust them to the evidence at trial."[5] In doing so, a trial court should tailor its charges to "match the allegations of indictments, either by charging only the relevant portions of the applicable Code sections or by giving a limiting instruction that directs the jury to consider only whether the crimes were committed in the manner alleged in the indictment."[6] And importantly, "in reviewing an allegedly erroneous jury instruction,

[5] *Palencia-Barron v. State*, 318 Ga. App. 301, 306 (3) (733 SE2d 824) (2012) (punctuation omitted); *accord Cash v. State*, 297 Ga. 859, 863 (2) (778 SE2d 785) (2015).

[6] *Braley v. State*, 276 Ga. 47, 53 (31) (572 SE2d 583) (2002); *accord Wheeler v. State*, 327 Ga. App. 313, 318 (3) (758 SE2d 840) (2014); *see Holman v. State*, 329 Ga. App. 393, 401 (2) (b) (ii) (765 SE2d 614) (2014) (holding that the instructions from the trial court must "sufficiently limit the jury's consideration to the allegations and elements of the offense as charged in the indictment" (punctuation omitted)).

we apply the plain legal error standard of review."[7] Bearing these guiding principles in mind, we turn now to the defendants' specific claim of error.

At the time the indictment in this case issued,[8] OCGA § 16-14-4 (a) of the Georgia RICO Act provided: "It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." OCGA § 16-14-4 (b) provided: "It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." And subsection (c) of the Act provided: "It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section."

---

[7] *Wheeler*, 327 Ga. App. at 318 (3) (punctuation omitted); *see Hartzler v. State*, 332 Ga. App. 674, 680 (3) (774 SE2d 738) (2015) (noting that appellate review of a jury charge is *de novo*).

[8] In 2015, the RICO Act was amended in several minor respects, but those amendments did not become effective until July 1, 2015, and have no bearing on these appeals. *See* Ga. L. 2015, Act 98, § 2-25.

In Count 1 of the indictment in this matter, the State charged all of the defendants with violating OCGA § 16-14-4 (c) of the RICO Act in that

> said accused . . . unlawfully conspired and endeavored to acquire and maintain, directly and indirectly, an interest in and control of U.S. Currency, the property of the Atlanta Public School System ("APS") and the Georgia Department of Education ("GaDOE") as further specified below, through a pattern of racketeering activity in violation of OCGA § 16-14-4 (a), and while employed by and associated with APS, unlawfully conspired and endeavored to conduct and participate in, directly and indirectly, APS through a pattern of racketeering activity, in violation of OCGA § 16-14-4 (b), as described below and incorporated by reference as if fully set forth herein; contrary to the laws of said State, the good order, peace and dignity thereof . . . .

During the charge conference, the State requested that the court instruct the jury that the State only had to prove that the defendants conspired to violate subsection (a) *or* subsection (b), even though the indictment stated that the defendants had violated both subsections, conjunctively. Over the defendants' objection, the court agreed. And indeed, after it instructed the jury on the State's burden of proof and the law pertaining to the RICO Act and conspiracy, the trial court instructed the jury specifically regarding Count 1 of the indictment as follows:

22

Some crimes, such as those charged in the indictment, may be committed in more than one way. Each defendant may only be convicted of the alleged charge in the specific manner that the defendant has been charged in this indictment.

I charge you that, whereas in Count 1 of the indictment, the State alleges that the defendant committed a crime in more than one way, the State need not prove that the defendant committed the crime in each way charged.

Rather, it is sufficient if you, the jury, should find beyond a reasonable doubt that the defendant committed the crime in at least one way, one of the ways alleged.

As previously noted, Cotman and Williamson contend that the trial court erred in essentially instructing the jury that it could convict the defendants of violating OCGA § 16-14-4 (c) disjunctively, *i.e.*, by finding that the defendants committed the crime in at least one of the two ways charged, even though the indictment charged the offenses conjunctively. But it is well settled that

> when a defendant is charged, as in this case, with the violation of a criminal statute containing disjunctively several ways or methods a crime may be committed, proof of any one of which is sufficient to constitute the crime, the indictment, in order to be good as against a

23

special demurrer, must charge such ways or methods conjunctively if it charges more than one of them.[9]

And at trial, it is sufficient for the State to show that "it was committed in any one of the separate ways listed in the indictment, even if the indictment uses the conjunctive rather than disjunctive form."[10] Moreover, as noted *supra*, the trial court here also charged the jury that the burden was on the State "to prove every material allegation of the indictment and every essential element of the crime charged beyond a reasonable doubt." Accordingly, the trial court did not err in instructing the jury that the State could prove that the defendants conspired to violate the RICO Act in at least one way of the two ways alleged.[11]

---

[9] *Cash*, 297 Ga. at 862 (2) (punctuation omitted); *see also Young v. State*, 226 Ga. 553, 554 (1) (176 SE2d 52) (1970) ("As a general rule, where a statute specifies several means or ways in which an offense may be committed in the alternative, it is bad pleading to allege such means or ways in the alternative; the proper way is to connect the various allegations in the accusing pleading with the conjunctive term 'and' and not with the word 'or.'" (citation and punctuation omitted)).

[10] *Cash*, 297 Ga. at 862 (2) (punctuation omitted); *accord Graham v. State*, 337 Ga. App. 193, 197-98 (2) (786 SE2d 857) (2016); *Gipson v. State*, 332 Ga. App. 309, 317 (5) (786 SE2d 857) (2015).

[11] *See Cash*, 297 Ga. at 862-63 (2) (holding that when a criminal statute contains disjunctive ways a crime can be committed, the State can show it was committed in any one of the ways listed in the indictment even if the indictment uses conjunctive language); *Graham*, 337 Ga. App. at 196-97 (2) (holding that trial court

24

In her reply brief, Cotman cites to *United States v. Gipson*[12] and proffers the novel contention that the trial court's challenged instruction constituted error because it allowed the jury to render a non-unanimous verdict as to Count 1. But pretermitting whether Cotman has waived this contention, given that she failed to specifically object to the trial court's instruction on this ground,[13] failed to object to the verdict

---

did not err by instructing the jury that the State did not have to prove all of the acts listed in each count of the indictment because "[i]f a crime may be committed in more than one way, it is sufficient for the State to show that it was committed in any one of the separate ways listed in the indictment, even if the indictment uses the conjunctive rather than disjunctive form" (punctuation omitted)); *Gipson*, 332 Ga. App. at 317-18 (5) (holding that court's charge was not error because the State may show that a crime was committed in any one of the separate ways listed in the indictment, even if the indictment uses the conjunctive rather than disjunctive form and because the court further instructed that the burden was on the State to prove every material allegation of the indictment and every material element of the crime charged beyond a reasonable doubt).

[12] 553 F2d 453 (5th Cir. 1977).

[13] *See Graham*, 337 Ga. App. at 197 (2) (noting that because the defendant failed to lodge any specific objection to the jury instruction he now challenges, we review the instruction to determine whether it constitutes plain error which affects substantial rights of the parties under OCGA § 17-8-58 (b)).

25

form,[14] and, as noted, raised this issue for the first time in her reply brief,[15] it nevertheless lacks merit.

In *Gipson*, the defendant was charged with one count of transporting a stolen vehicle in interstate commerce, in violation of 18 USC § 2312, and one count of selling or receiving a stolen vehicle moving in interstate commerce, in violation of 18 USC § 2313.[16] Not long after beginning deliberations, the jury requested additional instructions from the court via a note that read, "In Count Two, will he be guilty of all counts or will it be broken down?"[17] Perceiving that the question could be interpreted several ways, the trial court gave instructions responsive to each interpretation.[18] In response to its third interpretation of the jury's question, the court charged the jury as follows:

---

[14] *See Jones v. State*, 279 Ga. 854, 860 (7) (a) (622 SE2d 1) (2005) (holding that because defendant did not raise any objection to the form of the verdict below, he waived any right to assert error in that regard on appeal).

[15] *See Green v. State*, 339 Ga. App. 263, 271 (3) (793 SE2d 156) (2016) (declining to consider argument made for first time in reply brief that was beyond scope of enumerated error).

[16] *Gipson*, 553 F2d at 455 (I).

[17] *Id.*

[18] *Id.*

26

A third question that may be the one that the jury is really asking is, must there be an agreement by all twelve jurors as to which act of those several charged in Count Two, that the defendant did. For example, would it be possible for one juror to believe that the Defendant had stored property, and another juror to believe that he had received property, and so on. If all twelve agreed that he had done some one of those acts, but there was not agreement that he had done the same act, would that support a conviction? The answer is yes. If each of you is satisfied beyond any reasonable doubt that he did any one of those acts charged, and did it with the requisite state of mind, then there would be a unanimous verdict, and there could be a return of guilty under Count Two of the indictment, even though there may have been disagreement within the jury as to whether it was receiving or storing or what.[19]

Subsequently, the defendant objected, but the trial court overruled the objection.[20] And at the conclusion of the trial, the jury acquitted the defendant on Count One but convicted him on Count Two.[21] But the United States Court of Appeals for the Fifth Circuit reversed the conviction, finding that the trial court's instruction

authorized the jury to return a guilty verdict despite the fact that some jurors may have believed that [the defendant] engaged in conduct only

---

[19] *Id.* at 455-56 (I).

[20] *Id.* at 456 (I).

[21] *Id.* at 455 (I).

characterizable as receiving, concealing, or storing while other jurors were convinced that he committed acts only constituting bartering, selling, or disposing. Thus, under the instruction, the jury was permitted to convict [the defendant] even though there may have been significant disagreement among the jurors as to what he did.[22]

Accordingly, the Fifth Circuit concluded that the instruction was "violative of [the defendant's] right to a unanimous jury verdict."[23]

Nevertheless, in this matter, Cotman's argument that the trial court's instruction similarly sanctioned a non-unanimous verdict strains credulity given that the two cases are in no way factually analogous. Indeed, unlike the instruction at issue in *Gipson*,[24] the trial court in this matter did not instruct the jury that it could convict the defendants if some of the jurors found that the defendants conspired to violate subsection (a) of the RICO Act while others found that they conspired to violate subsection (b). Rather here, in stark contrast to *Gipson*, the trial court concluded its instructions by directing that "[w]hatever your verdict is, it must be unanimous; that means agreed by all."

---

[22] *Id.* at 458-59 (II).

[23] *Id.* at 459 (II).

[24] *See supra* note 19 and accompanying text.

28

Moreover, recognizing that *Gipson* in essence concerned verdict specificity and unanimity problems in situations involving alternative theories of *actus rea* under a criminal statute, the Supreme Court of the United States in *Schad v. Arizona*,[25] found the Fifth Circuit's approach wanting, specifically noting,

> [w]e are not persuaded that the *Gipson* approach really answers the question, however. Although the classification of alternatives into 'distinct conceptual groupings' is a way to express a judgment about the limits of permissible alternatives, the notion is too indeterminate to provide concrete guidance to courts faced with verdict specificity questions.[26]

Following on the heels of *Schad*, the Supreme Court of the United States reiterated in *Griffin v. United States*,[27] that "a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds—even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action."[28] Given the foregoing and the particular circumstances presented

---

[25] 501 U.S. 624 (111 SCt 2491, 115 LE2d 555) (1991).

[26] *Id.* at 635 (II) (A).

[27] 502 U.S. 46 (112 SCt 466, 116 LE2d 371) (1991) (Scalia, J.).

[28] *Id.* at 49 (II); *accord Jones v. State*, ___ Ga. ___, Slip op. at 4 (1) (Case No. S17A0301; decided May 1, 2017) (2017 WL 1548564).

in the case *sub judice*, Cotman's additional contention that the trial court's instruction as to Count 1 constituted error because it allowed the jury to render a non-unanimous verdict is without merit.

2. Cotman and Williamson also contend that the trial court erred in failing to find that the challenged jury instruction resulted in a fatal variance between the indictment and the evidence proven at trial. Again, we disagree.

We first note that the Supreme Court of Georgia has held that

[o]ur courts no longer employ an overly technical application of the fatal variance rule, focusing instead on materiality. The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to affect the substantial rights of the accused. It is the underlying reasons for the rule which must be served: 1) the allegations must definitely inform the accused as to the charges against him so as to enable him to present his defense and not to be taken by surprise, and 2) the allegations must be adequate to protect the accused against another prosecution for the same offense. Only if the allegations fail to meet these tests is the variance fatal.[29]

Here, in Count 1 of the indictment, the State charged all of the defendants in considerable detail, as previously discussed, with violating OCGA § 16-14-4 (c) of

---

[29] *Delacruz v. State*, 280 Ga. 392, 396 (3) (627 SE2d 579) (2006); *accord Jarrett v. State*, 299 Ga. App. 525, 529 (4) (683 SE2d 116) (2009).

the RICO Act by conspiring and endeavoring to engage in racketeering in violation

of OCGA § 16-14-4 (a) and by conspiring and endeavoring to engage in racketeering

in violation of OCGA § 16-14-4 (b). But in their appellate briefs, Cotman and

Williamson do not argue that these allegations failed to inform them of the charges,

took them by surprise, or failed to protect them against an additional prosecution for

the same offense. Rather, the defendants argue—similarly to their first claim of

error—that a fatal variance resulted when the indictment charged a violation of

OCGA § 16-14-4 (c) in two ways conjunctively, but the court instructed the jury that

the State could prove a violation in either of the ways charged disjunctively. But we

reiterate that "[when] a person is charged in an indictment with a crime in two ways

by using the conjunctive 'and' but [when] the statute contains 'or,' if it is proven that

the defendant violated the statute in either way he may be convicted."[30] And in such

---

[30] *Jarrett*, 299 Ga. App. at 530 (6) (punctuation omitted); *see Stone v. State*, 229 Ga. App. 367, 370 (1) (b) (494 SE2d 48) (1997) (noting that if a crime may be committed in more than one way, it is sufficient for the State to show that it was committed in any one of the separate ways listed in the indictment, even if the indictment uses the conjunctive rather than disjunctive form).

31

circumstances, there is "no fatal variance between the court's charge and the indictment."[31]

Furthermore, although even the most generous reading of the defendants' briefs gleans no contention on their part that a fatal variance occurred because the State failed to sufficiently prove that the defendants violated OCGA § 16-14-4 (c) in either of the ways alleged in the indictment, the record, nevertheless, demonstrates that the State presented sufficient evidence that Cotman and Williamson conspired to violate OCGA § 16-14-4 (a) and (b).

A person participates in a "pattern of racketeering activity" when he or she engages "in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents."[32] Additionally, under the statute, the term "'[r]acketeering activity' means to commit" a number of crimes

---

[31] *Jarrett*, 299 Ga. App. at 530 (6); *see Thomas v. State*, 192 Ga. App. 427, 427-28 (385 SE2d 310) (1989) (holding that variation between indictment, which charged defendant with receiving "and" retaining stolen property, and receiving stolen property statute that trial court read to jury, which defined offense as receipt, disposition "or" retention of such property, was not error).

[32] *See* former OCGA § 16-14-3 (8) (A) (2011).

32

chargeable by indictment under the laws of Georgia, as set forth in OCGA § 16-14-3 (9) (A) (i) – (xxxvii), including the crimes of theft and those relating to perjury and other falsifications.[33] And under Georgia law, a person may be found guilty of a RICO conspiracy "if they knowingly and willfully join a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts."[34]

Here, as recounted in detail *supra*, the evidence showed that APS administrators and teachers, including Dr. Hall, Cotman, and Williamson, received bonuses and increases in their salaries if Targets and AYP were met and that those goals were often met as a direct result of cheating on the CRCT. The evidence also showed that, on several occasions, Cotman was informed regarding instances of cheating but took no action to investigate such and, in fact, punished those who reported cheating with demotions or terminations of employment. In addition, the evidence showed that Williamson cheated on the CRCT, a State document, by improperly providing students with correct answers and by changing wrong answers to correct ones on tests that had been completed. The evidence further showed that

---

[33] *See* former OCGA § 16-14-3 (9) (A) (ix), (xv) (2011).

[34] *Rosen v. Protective Life Ins. Co.*, 817 FSupp2d 1357, 1382 (II) (G) (N.D. Ga. 2011) (applying the Georgia RICO Act); *accord Wylie v. Denton*, 323 Ga. App. 161, 165 (1) (746 SE2d 689) (2013) (physical precedent only).

33

Williamson lied to law enforcement when confronted with claims that she cheated. Thus, the evidence was sufficient to support the defendants' convictions,[35] and any fatal variance claim in this regard lacks merit.

3. Cotman and Williamson further contend that the trial court erred in sentencing them under the RICO Act rather than the general conspiracy statute, arguing that sentencing them under the former violated the rule of lenity. Yet again, we disagree.

As discussed at length, *supra*, Cotman and Williamson were charged and convicted of conspiracy to violate the RICO Act under OCGA § 16-14-4 (c). And OCGA § 16-14-5 (a), the sentencing section of the RICO Act, provides that "[a]ny person convicted of the offense of engaging in activity in violation of Code Section 16-14-4 shall be guilty of a felony and shall be punished by not less than five nor

---

[35] *See Dorsey v. State*, 279 Ga. 534, 540 (2) (b) (615 SE2d 512) (2005) (holding that evidence was sufficient to establish that defendant, as county sheriff, acquired property and money through a pattern of racketeering, thus supporting his conviction under the RICO Act); *Brown v. State*, 321 Ga. App. 198, 204 (4) (739 SE2d 118) (2013) (holding that the evidence that defendant conspired with other employees to falsify overtime records in exchange for payment was sufficient to support defendant's RICO conviction); *Martin v. State*, 189 Ga. App. 483, 489-90 (5) (376 SE2d 888) (1988) (finding that evidence was sufficient to show that three attorneys were part of RICO enterprise which engaged in ticket-fixing of alcohol-related charges by removing files relating to charges from county solicitor's office); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt. 2781, 61 LE2d 560) (1979).

more than 20 years' imprisonment or the fine specified in subsection (b) of this Code section, or both."

In this matter, after conducting a hearing, the trial court sentenced Cotman to twenty years, with seven years to serve in incarceration, and sentenced Williamson to five years, with two years to serve in incarceration. And although these sentences were within the range provided in OCGA § 16-14-5 (a), the defendants argue that they should have been sentenced under the general conspiracy statute, which provides:

> A person convicted of the offense of criminal conspiracy to commit a felony shall be punished by imprisonment for not less than one year nor more than one-half the maximum period of time for which he could have been sentenced if he had been convicted of the crime conspired to have been committed, by one-half the maximum fine to which he could have been subjected if he had been convicted of such crime, or both.[36]

Specifically, they argue that because the general conspiracy statute requires a trial court to impose a sentence that is not more than one-half the maximum period of time for which defendants could have been sentenced if they had been convicted of the

---

[36] OCGA § 16-4-8.

crime conspired to have been committed,[37] sentencing them under the RICO Act violated the rule of lenity.

As we have previously explained, the rule of lenity "ensures that if and when an ambiguity exists in one or more statutes, such that the law exacts varying degrees of punishment for the same offense, the ambiguity will be resolved in favor of a defendant, who will then receive the lesser punishment."[38] But the rule of lenity comes into play only to "resolve ambiguities that remain after applying all other tools of statutory construction."[39] Importantly, when "there is a specific and a general criminal statute, the rule of lenity is not implicated, and a specific statute will prevail

---

[37] *See id*.

[38] *Gordon v. State*, 334 Ga. App. 633, 634 (780 SE2d 376) (2015) (punctuation omitted); *see McNair v. State*, 293 Ga. 282, 283 (745 SE2d 646) (2013) (noting that the rule of lenity provides that statutory ambiguity is resolved in favor of the defendant, who will then receive the lesser punishment); *Issa v. State*, 340 Ga. App. 327, 341 (7) (796 SE2d 725) (2017) (same); *Mathis v. State*, 336 Ga. App. 257, 260 (784 SE2d 98) (2016) (same).

[39] *State v. Nankervis*, 295 Ga. 406, 409 (2) (761 SE2d 1) (2014) (punctuation omitted); *see Woods v. State*, 279 Ga. 28, 31 (3) (608 SE2d 631) (2005) (holding that when a crime is penalized by a special law, the general provisions of the penal code are not applicable); *McWhorter v. State*, 275 Ga. App. 624, 629 (2) (621 SE2d 571) (2005) (same).

over a general statute, absent any indication of a contrary legislative [directive]."[40]

And here, the clear language of OCGA § 16-14-5 (a) demonstrates that it is a specific law criminalizing a violation of any part of OCGA § 16-14-4.[41] Consequently, the trial court did not err in sentencing Cotman and Williamson under the specific provisions of OCGA § 16-14-5 (a).[42]

4. Finally, Cotman contends that the trial court erred in denying her plea in bar of double jeopardy. Once again, we disagree.

---

[40] *Nankervis*, 295 Ga. at 409 (2) (punctuation omitted); *see Woods v. State*, 279 Ga. 28, 31 (3) (608 SE2d 631) (2005) (holding that when "a crime is penalized by a special law, the general provisions of the penal code are not applicable").

[41] *See* OCGA § 16-14-5 (a).

[42] *See Nankervis*, 295 Ga. at 409-10 (2) (holding that the rule of lenity did not apply in prosecution for methamphetamine trafficking and, thus, trial court was precluded from sentencing defendant for manufacturing a controlled substance given that methamphetamine trafficking statute was more specific than general statutory provisions for manufacturing controlled substances); *Woods*, 279 Ga. at 30-31 (3) (holding that trial court did not err in sentencing defendant under OCGA § 16-13-33, rather than the general "attempt" statute (OCGA § 16-4-6), because "the two sentencing statutes are mutually exclusive and there is no uncertainty as to which applies—OCGA § 16-13-33 renders OCGA § 16-4-6 inapplicable in prosecutions under the Georgia Controlled Substances Act."); *McWhorter*, 275 Ga. App. at 629-30 (2) (finding that general statute limiting sentece for conspiracy to one-half maximum sentence for substantive crime did not apply when imposing sentence for offense of conspiracy to manufacture methamphetamine because Controlled Substances Act specifically allowed imposition of maximum sentence for substantive crime when imposing sentence for conspiracy to commit crime).

As discussed *supra*, in Count 4 of the original indictment, the State charged Cotman with the offense of influencing a witness, specifically alleging that she "did intimidate [principal] Jimmye Hawkins." Cotman filed a special demurrer, which prompted the State to re-indict her solely on the same charge of influencing Hawkins but with additional details specifying the nature of the intimidation. The State then filed a motion requesting that the trial court enter an order of nolle prosequi as to Count 4 in the original indictment and join the new indictment with the original for trial purposes. But Cotman objected to joinder, demanded a speedy trial on the new indictment, and, at the conclusion of that trial, was acquitted.

Cotman then filed a plea in bar of former jeopardy, arguing that the State was precluded from trying her on either the RICO or influencing-a-witness charges in the original indictment. Subsequently, the trial court granted Cotman's plea in bar as to the influencing-a-witness charge but denied it as to the RICO charge. On appeal, we affirmed the trial court's ruling, concluding "that Cotman, having opposed the State's invitation to join the two indictments for a single trial, faces subsequent prosecution because of her own election and thereby waived the protections against subsequent prosecutions afforded by OCGA § 16-1-8 (b)."[43] But in that same opinion, we also

[43] *Cotman*, 328 Ga. App. at 826 (1).

noted that "Cotman [did] not argue substantive double jeopardy for purposes of the appeal."[44] Thus, in this appeal, Cotman now contends that the trial court erred in denying her plea in bar because the subsequent prosecution on the RICO charge was barred by substantive double jeopardy.

It is well established that the prohibition against double jeopardy in both the United States Constitution[45] and the Georgia Constitution[46] protects our citizens from, *inter alia*, being prosecuted a second time for the same offense after an acquittal or conviction.[47] More specifically, double jeopardy protects against three types of

---

[44] *Id.* at 825 (1) n.5.

[45] *See* U.S. CONST. amend. V (". . . nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb. . . ."); *see also Brown v. Ohio*, 432 U.S. 161, 165 (II) (97 SCt 2221, 53 LE2d 187) (1977) ("Because it was designed originally to embody the protection of the common-law pleas of former jeopardy, the Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial." (citation and footnote omitted)).

[46] *See* GA. CONST. Art. 1, § 1, ¶ XVIII ("No person shall be put in jeopardy of life or liberty more than once for the same offense except when a new trial has been granted after conviction or in case of a mistrial.").

[47] *See Phillips v. State*, 298 Ga. App. 520, 521 (1) (680 SE2d 424) (2009) ("The prohibition against double jeopardy in both the United States and Georgia

abuses: "(1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense."[48] And the standard of review of a "grant or denial of a double jeopardy plea in bar is whether, after reviewing the trial court's oral and written rulings as a whole, the trial court's findings support its conclusion."[49] Bearing these guiding principles in mind, we turn now to Cotman's specific claim.

The well established test for determining whether two offenses are sufficiently distinguishable to avoid the prohibition against double jeopardy and, thereby, permit the imposition of cumulative punishment, was delineated in *Blockburger v. United States*,[50] in which the Supreme Court of the United States held: "[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses

---

Constitutions, among other things, protects against a second prosecution for the same offense after acquittal or conviction.").

[48] *Garrett v. State*, 306 Ga. App. 429, 430 (702 SE2d 470) (2010), *citing North Carolina v. Pearce*, 395 U.S. 711, 717 (89 SCt 2072, 23 LE2d 656) (1969).

[49] *Johns v. State*, 319 Ga. App. 718, 719 (738 SE2d 304) (2013) (punctuation omitted).

[50] 284 U.S. 299 (52 S.Ct. 180, 76 LEd. 306) (1932).

or only one, is whether each provision requires proof of a fact which the other does not."[51] Furthermore, the Supreme Court of the United States has also "recognized that the *Blockburger* test focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial."[52] Accordingly, if each statute requires proof of an additional fact which the other does not, the offenses are not the same under the *Blockburger* test.[53]

As previously noted, in her earlier trial, Cotman was acquitted on the charge of influencing a witness under OCGA § 16-10-93 (b) (1) (C), which provides:

It shall be unlawful for any person knowingly to use intimidation, physical force, or threats; to persuade another person by means of corruption or to attempt to do so; or to engage in misleading conduct toward another person with intent to . . . [h]inder, delay, or prevent the

---

[51] *Id.* at 304; *accord Garrett*, 306 Ga. App. at 430. This constitutional test is also codified under OCGA § 16-1-8 (b). *See McCannon v. State*, 252 Ga. 515, 519, 315 SE2d 413 (1984). Moreover, the Supreme Court of Georgia specifically adopted the "required evidence" test under *Blockburger* for determining when one crime is "included in" another under OCGA §§ 16-1-6 and 16-1-7 (a) (1). *Drinkard v. Walker*, 281 Ga. 211, 216 (636 SE2d 530) (2006).

[52] *Garrett*, 306 Ga. App. at 431 (punctuation omitted), *citing Illinois v. Vitale*, 447 U.S. 410, 416 (100 SCt 2260, 65 LE2d 228) (1980).

[53] *See Garrett*, 306 Ga. App. at 431 (punctuation omitted); *see also Ledford v. State*, 289 Ga. 70, 71 (1) (709 SE2d 239) (2011) (applying "required evidence" test for determining whether one offense is included in another).

41

communication to a law enforcement officer, prosecuting attorney, or judge of this state of information relating to the commission or possible commission of a criminal offense or a violation of conditions of probation, parole, or release pending judicial proceedings.

But racketeering is "a special type of compound offense, not simply a more serious grade of forgery, robbery, homicide, or any of the other offenses specified in the Act as predicate offenses."[54] And although influencing a witness can be a predicate offense supporting a RICO charge,[55] it is certainly not a necessary element of such a charge. More importantly, it was not a predicate offense in Cotman's RICO trial. In fact, the amended indictment did not allege that Cotman engaged in influencing a witness, either as a predicate act of the RICO charge or as a separate charge, and the State presented no evidence during the trial pertaining to the charge for which Cotman was acquitted in her first trial—*i.e.*, her alleged attempt to intimidate Principal Hawkins from speaking with the GBI. Furthermore, while Cotman is correct that many of the same witnesses who testified during her first trial also testified during her RICO trial, none of those witnesses testified regarding the specific meeting

---

[54] *Redford v. State*, 309 Ga. App. 118, 122 (710 SE2d 197) (2011).

[55] *See* former OCGA § 16-14-3 (9) (A) (xiv) (2011).

42

with Principal Hawkins that resulted in the influencing-a-witness charge. Regardless, Cotman's focus on such witness overlap in the two trials is misplaced given, as discussed *supra*, that "the *Blockburger* test focuses on the proof necessary to prove the statutory elements of each offense, *rather than on the actual evidence to be presented at trial*."[56] Accordingly, Cotman's prosecution on the RICO charge after she was acquitted on the influencing-a-witness charge was not barred by substantive double jeopardy.[57]

For all these reasons, we affirm Cotman and Williamson's convictions in both Case No. A17A1050 and Case No. A17A1051.

*Judgment affirmed in both cases. Ray, P. J., and Self, J., concur.*

---

[56] *See supra* note 51 and accompanying text (emphasis added).

[57] *See Stepp v. State*, 286 Ga. 556, 558-59 (690 SE2d 161) (2010) (holding that defendant's conviction in recorder's court for violation of county ordinance regulating her responsibilities as pet owner did not bar, on double jeopardy grounds, subsequent prosecution in state court for misdemeanor reckless conduct, as violation of county ordinance required proof of ownership of animal, whereas reckless conduct statute did not, and violation of reckless conduct statute required proof of actual bodily harm being caused, which ordinance did not); *Southwell v. State*, 320 Ga. App. 763, 763-65 (1) (740 SE2d 725) (2013) (holding that defendant's separate convictions for robbery by intimidation and felony theft by taking did not violate prohibition against double jeopardy because robbery by intimidation was based on defendant's act of threatening victim with knife to obtain money, while theft was based on stealing victim's car and did not require proof that taking was by intimidation).