308 Ga. 104
FINAL COPY

S19A1361.  MCELRATH V. THE STATE.

MELTON, Chief Justice.

On December 11, 2017, a jury found Damian McElrath guilty but mentally ill of the felony murder and aggravated assault of his adoptive mother, Diane, whom McElrath killed by stabbing over 50 times in a single episode.[1] Based on the same episode, McElrath was also found not guilty of the malice murder of Diane by reason of insanity. McElrath now appeals, contending among other things

[1] On October 4, 2012, McElrath was indicted for malice murder, felony murder predicated on aggravated assault, and aggravated assault — all based on the stabbing death of Diane. McElrath was originally convicted in a bench trial, but the trial court granted a motion for new trial filed by McElrath on June 21, 2016. McElrath was subsequently retried before a jury. On December 11, 2017, the jury found McElrath not guilty by reason of insanity for the malice murder of Diane, and guilty but mentally ill of felony murder and its predicate of aggravated assault. On December 14, McElrath was sentenced to life imprisonment for felony murder, and the aggravated assault count was merged into the conviction for felony murder for sentencing purposes. On the same day, in a separate order, the trial court committed McElrath to a state mental health facility for evaluation pursuant to OCGA § 17-7-131. On December 28, 2017, McElrath filed a motion for new trial. The trial court denied the motion on April 26, 2019. McElrath timely filed a notice of appeal, and his case was docketed to the August 2019 term of this Court. The case was orally argued on October 22, 2019.

that the jury's verdicts were repugnant and that his conviction for felony murder must be reversed or vacated. McElrath also appeals the trial court's separate order that, upon his discharge from evaluation at a state mental health facility, he should be placed in the custody of the Department of Corrections.[2] Under the specific facts of this case, we conclude that McElrath's verdicts are repugnant. Accordingly, we vacate both verdicts and remand McElrath's case for a new trial. We also vacate the trial court's order placing McElrath in the Department of Corrections's custody pursuant to the verdicts which now stand vacated.

1. *The Evidence at Trial.*

(a) The evidence presented at trial showed that McElrath, who was 18 at the time of the stabbing, had suffered from either schizophrenia or a related schizoaffective disorder. As a result of this

---

[2] While his motion for new trial was still pending, McElrath filed a separate notice of appeal from this decision; however, on July 1, 2019, this Court dismissed that appeal for failing to follow the interlocutory procedures under OCGA § 5-6-34 (b) and informed McElrath that he could raise any challenge to this order as part of the present appeal.

disorder, McElrath had a long history of disciplinary problems, including difficulties with Diane.[3] Over time, McElrath began to believe that Diane was poisoning his food and beverages.[4] Although the timeline is not exact, this delusion began approximately three years before Diane's death. The week before the stabbing occurred, McElrath had to be hospitalized in a mental health facility because of his behavior and thoughts, which included delusions that he was an FBI agent who regularly traveled to Russia and who had killed a number of people as such an agent. On the day before the stabbing, or slightly earlier, McElrath believed that Diane confronted him and admitted that she had been poisoning him.

On July 16, 2012, McElrath stabbed Diane more than 50 times in an attack that began in an upstairs bedroom of the home Diane and McElrath shared and ended at the front door. There, Diane

---

[3] For example, McElrath shoplifted five iPads on one occasion, and, in a separate incident, he had a quarrel with Diane that resulted in police being called to the home to investigate. At one point, Diane felt it was necessary to force McElrath to stay in an extended-stay hotel for approximately two months.

[4] According to McElrath, Diane was putting ammonia in his lemonade and spraying insect poison on his ice.

collapsed and died. After the stabbing, McElrath changed his clothes, cleaned Diane's blood off of his body, and washed a wound on his hand that he sustained during the stabbing. He wrote a note titled "My Antisocial Life," claiming that Diane told him that she had been poisoning him. In the note, McElrath stated that he was not sorry about what he had done and that "she poisoned me so I killed her." He added that "I think I am right for doing it." McElrath then called 911 and reported that he killed his mother because she poisoned him. McElrath asked the dispatcher if he was wrong to do that.

Shortly thereafter, police arrived at the scene. McElrath was transported to the police station for interrogation, where he admitted that "I killed my Mom because she poisoned me." When the detective attempted to clarify any difficulties McElrath may have had with Diane, McElrath stated that he was only mad that she poisoned him. When the detective asked him if he thought stabbing Diane was right or wrong, McElrath stated, "It was right to me."

The evidence at the scene, including blood spatter on the upstairs wall, blood on the upper landing carpet, and blood on the stairway bannister and wall, suggested that the attack began on the upper level of the house and continued toward the front door where Diane ultimately died. The medical examiner determined that Diane had been stabbed more than 50 times, and that the wounds were primarily located on her face, neck, upper torso, and upper extremities.[5]

A number of experts testified at McElrath's trial.[6] There was a general consensus that McElrath was, in fact, mentally ill and suffering from at least some delusions, including the delusion that he was being poisoned by Diane. Dr. Kevin Richards, the defense expert, testified that, at the time McElrath stabbed Diane, McElrath was acting under the delusion that he was in imminent danger of

---

[5] Due to the number of wounds, the medical examiner could not make an accurate determination as to which stab cut Diane's jugular vein.

[6] The experts included: Dr. Kevin Richards, a forensic psychologist hired by the defense; Dr. Julie Rand Dorney, a psychiatrist hired by the State; and Dr. Samuel Perri and Dr. Kiana Wright, both of whom worked for the State Department of Behavioral Health and Developmental Disabilities.

death.[7] In other words, McElrath was acting under the false belief, though real to him, that he would die if he did not immediately protect himself against Diane.[8]

(b) As an initial matter, this evidence authorized the jury to find that McElrath was not guilty of malice murder by reason of insanity at the time that he stabbed his mother.

> In Georgia, a defendant is presumed to be sane and "a defendant asserting an insanity defense has the burden to prove by a preponderance of the evidence that he was insane at the time the crime was committed." *Buford* [*v. State*], 300 Ga. [121, 122 (1) (b) (793 SE2d 91) (2016)] (citing *Alvelo v. State*, 290 Ga. 609 (3) (724 SE2d 377) (2012)). A defendant may prove insanity by showing that,

---

[7] Dr. Richards classified McElrath's thoughts as a "multifaceted delusion" including "[t]he delusion [Diane] was poisoning him; the delusion that [McElrath] was about to die; the delusion that [Diane] was going to keep poisoning him; the delusion [Diane] wanted to kill him. All of it's — it's all delusional. [Diane] wasn't poisoning him. So his belief that he was in [imm]inent danger was delusional." Dr. Julie Rand Dorney, one of the State's experts, also testified that a paranoid delusion can contain the additional component that one's life is in immediate danger. And, Dr. Samuel Perri, a state psychologist, testified that he read the reports generated by Dr. Richards and Dr. Dorney, and he agreed with their conclusions that McElrath suffered from a schizophrenia-type illness coupled with delusions.

[8] Dr. Richards testified: "The reason [McElrath] killed [Diane] is because she was poisoning him, and not only that she was poisoning him, that he was in imminent danger because now she had admitted it. . . ." Dr. Richards further testified: "[McElrath] said he [stabbed Diane] that day because [Diane] admitted [to poisoning him] and now she knew that he knew and he was going to die now; [McElrath] was sure of it and he was in [imm]inent danger."

6

at the time of the incident, he lacked the mental capacity to distinguish right from wrong or that he was suffering from a delusional compulsion. See OCGA §§ 16-3-2[9] and 16-3-3;[10] *Buford*, [supra], 300 Ga. [at 124-125].

*Bowman v. State*, 306 Ga. 97, 100 (1) (c) (829 SE2d 139) (2019). The delusional compulsion defense is available only when the defendant is "suffering under delusions of an absurd and unfounded nature [and] was compelled by that delusion to act in a manner that would have been lawful and right if the facts had been as the defendant imagined them to be." (Footnote omitted.) *Lawrence v. State*, 265 Ga. 310, 313 (2) (454 SE2d 446) (1995).

Here, Dr. Richards testified specifically that McElrath was suffering from a multifaceted delusion, one in which he believed *both*

---

[9] This statute provides:
A person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence.
[10] This statute provides:
A person shall not be found guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime.

that Diane was poisoning him *and* that he was in imminent danger of death at the time that he attacked Diane.[11] This "absurd or unfounded" delusion authorized the jury to determine that, under the facts *as McElrath believed them to be*, his actions were justified.

(c) But there was also sufficient evidence to allow the jury to find beyond a reasonable doubt that McElrath was guilty but mentally ill of felony murder based on aggravated assault for stabbing Diane.[12] As to guilt, McElrath admitted that he stabbed Diane, and his confession was amply corroborated by the forensic

---

[11] Although other experts did not directly testify at trial that McElrath was acting under a delusion of imminent danger at the time of the stabbing, they did testify that such a delusion could affect a person's ability to control his behavior.

[12] OCGA § 17-7-131 (a) (3) defines "mentally ill" as

having a disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. However, the term "mental illness" shall not include a mental state manifested only by repeated unlawful or antisocial conduct.

OCGA § 17-7-131 (c) (2) provides, in turn:

The defendant may be found "guilty but mentally ill at the time of the crime" if the jury, or court acting as trier of facts, finds beyond a reasonable doubt that the defendant is guilty of the crime charged and was mentally ill at the time of the commission of the crime. If the court or jury should make such finding, it shall so specify in its verdict.

and other evidence. As to mental illness, it is largely undisputed that McElrath was mentally ill at the time of the crime and, in fact, had been so for years. And, while there was evidence that McElrath suffered from delusions at times, the jury was authorized to determine that McElrath was not delusional at the time of the stabbing or that, even if he was, any delusion that he was experiencing did not justify the stabbing. For example, the jury could have accepted that McElrath suffered from the delusion that Diane had been poisoning him, but rejected that he had any delusion that his life was in imminent danger. Under such a scenario, the stabbing would not be justified, and the jury could have concluded that McElrath stabbed Diane because he was admittedly angry with her. The evidence thus supported the jury's alternative determination that McElrath was guilty but mentally ill of the felony murder of Diane based on aggravated assault under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. *Classification of McElrath's Contradictory Verdicts.*

9

The jury's verdicts in this case are marked by an inherent contradiction. As such, it becomes necessary to determine how to characterize those verdicts. There are three main classes of contradictory verdicts: "inconsistent verdicts," "mutually exclusive verdicts," and "repugnant verdicts."[13] We will analyze each in turn.

(a) *Inconsistent verdicts*. As a general rule, inconsistent verdicts occur when a jury in a criminal case renders seemingly incompatible verdicts of *guilty* on one charge and *not guilty* on another. In Georgia, as explained below, we have abolished the rule that inconsistent verdicts require reversal. *Milam v. State*, 255 Ga. 560, 562 (2) (341 SE2d 216) (1986). Perhaps the classic example of inconsistent verdicts occurred in *United States v. Powell*, 469 U. S. 57 (105 SCt 471, 83 LE2d 461) (1984). In *Powell*, the defendant was acquitted of conspiring to possess cocaine with the intent to distribute but convicted of the "compound offenses of using the telephone in 'committing and in causing and facilitating' certain

---

[13] Cases from Georgia appellate courts and elsewhere have often conflated these categories, in particular using "inconsistent" to describe all types of contradictory verdicts.

felonies — 'conspiracy to possess with intent to distribute and possession with intent to distribute cocaine.'" Id. at 60. Though the Supreme Court recognized the internal inconsistency in these verdicts, it nonetheless allowed them to stand, explaining that

> where truly inconsistent verdicts have been reached, "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *Dunn* [*v. United States*, 284 U. S. 390, 393 (52 SCt 189, 76 LE 356) (1932)]. The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors. First, as the above quote suggests, inconsistent verdicts — even verdicts that acquit on a predicate offense while convicting on the compound offense — should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.

(Citations omitted.) Id. at 64-65. The Supreme Court then further concluded:

> Inconsistent verdicts therefore present a situation where

11

"error," in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course.

Id. at 65.

Eventually, we followed the United States Supreme Court's approach to inconsistent verdicts.

In *Milam v. State*, [supra], this Court abolished the rule that inconsistent verdicts in irreconcilable conflict in criminal cases warranted reversal (see *Hines v. State*, 254 Ga. 386, 387 (329 SE2d 479) (1985)), adopting the rationale set out by the U. S. Supreme Court in *United States v. Powell*, [supra], in its exercise of supervisory powers over the federal criminal process. Id. at 65. . . . In our cases endorsing the abolition of the inconsistent verdict rule, we have determined it is not generally within the court's power to make inquiries into the jury's deliberations, or to speculate about the reasons for any inconsistency between guilty and not guilty verdicts. *Dumas v. State*, 266 Ga. 797 (2) (471 SE2d 508) (1996). As we observed in *King v. Waters*, 278 Ga. 122 (1) (598 SE2d 476) (2004), appellate courts "cannot know and should not speculate why a jury acquitted on . . . [one] offense and convicted on . . . [another] offense. The reason could be an error by the jury in its consideration or it could be mistake, compromise, or lenity. . . ."

*Turner v. State*, 283 Ga. 17, 20 (2) (655 SE2d 589) (2008).

12

For reasons that will be made clear in Division 2 (c), infra, McElrath's verdicts cannot be classified simply as "inconsistent verdicts."

(b) *Mutually exclusive verdicts.* The term "mutually exclusive" generally applies to *two guilty* verdicts that cannot legally exist simultaneously. In such cases, where it is "both legally and logically impossible to convict [on] both counts, a new trial [should be] ordered." *Dumas*, supra, 266 Ga. at 799 (2). In *Dumas*, we explained:

> [V]irtually all . . . Georgia cases affirming Georgia's abolition of the inconsistent verdict rule involve jury verdicts of guilty and not guilty that are alleged to be inconsistent. These cases are in accordance with the principle that it is not generally within the trial court's power to make inquiries into the jury's deliberations, or to speculate about the reasons for any inconsistency between guilty and not guilty verdicts. However, this appeal presents an entirely different scenario, because it involves two verdicts of guilty that not only were inconsistent, but also were mutually exclusive.

(Footnotes and emphasis omitted.) Id. We went on to point out that

> where there are mutually exclusive convictions, it is insufficient for an appellate court merely to set aside the lesser verdict, because to do so is to speculate about what the jury might have done if properly instructed, and to usurp the functions of both the jury and trial court.

13

*Thomas v. State*, 261 Ga. 854 (413 SE2d 196) (1992).

*Dumas*, supra, 266 Ga. at 800.

*Dumas* illustrates the problem of mutually exclusive verdicts. In that case, the jury found the defendant guilty of malice murder, vehicular homicide, and driving under the influence. Thereafter, the trial court instructed the jury it had rendered contradictory verdicts, and, as a result, the trial court sent the jury back for further deliberations. The jury later returned verdicts finding the defendant guilty of malice murder and driving under the influence. On appeal, the defendant argued both that the trial court was obligated to accept the jury's first verdicts and that the essential elements of malice murder and vehicular homicide contradicted each other, making those verdicts mutually exclusive. Id. at 798 (1).

We ultimately affirmed the defendant's conviction based on the second set of verdicts. We ruled that the first verdicts could not be accepted because the guilty verdicts for malice murder, an offense requiring a showing of the *presence* of malice aforethought, and vehicular homicide, requiring a showing of the *absence* of malice

14

aforethought, were mutually exclusive and therefore vacated. Id. at

800 (2).[14]

As McElrath's verdicts are not two contradictory guilty

verdicts, his verdicts cannot be classified as "mutually exclusive."

(c) *Repugnant verdicts*. Though they do not involve two guilty

---

[14] This result, however, should be contrasted with *State v. Springer*, 297 Ga. 376 (774 SE2d 106) (2015). In *Springer*,

> the jury found Springer not guilty of felony murder but returned guilty verdicts on charges of aggravated assault and involuntary manslaughter predicated on the offense of reckless conduct. The trial court charged the jury as to both the [OCGA § 16-5-20] (a) (1) and (a) (2) definitions of assault, authorizing the jury to return a verdict based on either definition, and the jury's verdict as to aggravated assault did not specify on which subsection it was based, leaving the possibility that the jury determined Springer both committed the assault with the intent to harm the victim and, at the same time, consciously disregarded a substantial and unjustifiable risk that his act of shooting a gun in a public parking lot would cause harm or endanger the safety of another.

Id. at 383 (3). We concluded that these verdicts, however, were not mutually exclusive, as

> the essential distinction between these crimes [is] the level of mental culpability. Such distinction does not mean that findings of guilt as to both offenses are irreconcilable or that if the State proves the greater mens rea, a jury would not be authorized to convict of the lesser included crime based on the finding of the greater. One cannot and should not be allowed to defend against a lesser included charge by proving that he is more culpable. Accordingly, we conclude that multiple guilty verdicts for the same conduct that are based on varying levels of mens rea are not mutually exclusive.

(Citation and footnote omitted.) Id. at 381 (1).

15

convictions, repugnant verdicts suffer from a similar infirmity as mutually exclusive verdicts; they occur when, in order to find the defendant not guilty on one count and guilty on another, the jury must make *affirmative* findings shown on the record that cannot logically or legally exist at the same time. Where a jury renders repugnant verdicts, both verdicts must be vacated and a new trial ordered for the same reasons applicable to mutually exclusive verdicts. See *Dumas*, supra. Though we did not use the term "repugnant verdicts" expressly, we did describe them in *Turner*, supra. There, we explained that,

> when[,] instead of being left to speculate about the unknown motivations of the jury [regarding its return of contradictory verdicts,] the appellate record makes transparent the jury's reasoning why it found the defendant not guilty of one of the charges, "[t]here is . . . no speculation, and the policy explained in *Powell* and adopted in *Milam*, supra, . . . does not apply." *King v. Waters*, supra, 278 Ga. at 123.

*Turner*, supra, 283 Ga. at 20-21 (2). See also *Guajardo v. State*, 290 Ga. 172 (2) (718 SE2d 292) (2011).

This case falls into the category of repugnant verdicts, as the

16

guilty and not guilty verdicts reflect affirmative findings by the jury that are not legally and logically possible of existing simultaneously. This is because the not guilty by reason of insanity verdict on malice murder and the guilty but mentally ill verdict on felony murder based on aggravated assault required affirmative findings of different mental states that could not exist at the same time during the commission of those crimes as they were indicted, proved, and charged to the jury.[15] Put simply, it is not legally possible for an individual to simultaneously be insane and not insane during a single criminal episode against a single victim, even if the episode gives rise to more than one crime.

In this case, the jury must have determined that McElrath was

---

[15] In McElrath's indictment, there was no real differentiation between the three counts regarding McElrath's alleged conduct. For malice murder, McElrath was accused of "unlawfully and with malice aforethought, caus[ing] the death of Diane McElrath by stabbing [her]." For felony murder, McElrath was accused of "caus[ing] the death of Diane McElrath by stabbing her" during "the commission of the felony offense of Aggravated Assault." And, for aggravated assault, McElrath was accused of "assault[ing] Diane McElrath with a knife, a deadly weapon." Nor did the State seek to prove, or the trial court instruct the jury, that the crimes occurred at different times or through distinct acts. See, e.g., *Gomez v. State*, 301 Ga. 445, 455 (4) (b) (801 SE2d 847) (2017) (describing the concept of a "deliberate interval" between acts).

legally insane at the time that he stabbed Diane in order to support the finding that he was not guilty of malice murder by reason of insanity. Nonetheless, the jury went on to find McElrath guilty but mentally ill of felony murder based on the same stabbing — a logical and legal impossibility. For this reason, the verdicts in this case are repugnant, both verdicts must be vacated, and McElrath's case must be remanded for a new trial.[16]

3. *Milam and Shepherd Do Not Control.*

Contrary to the State's arguments, McElrath's case is not

_____

[16] We note that, in *Blevins v. State*, 343 Ga. App. 539 (808 SE2d 740) (2017), the Court of Appeals, while analyzing *Carter v. State*, 298 Ga. 867 (785 SE2d 274) (2016), ruled that *Carter* supported the broad application of *Milam*'s inconsistent verdict rule to abolish repugnant verdicts. In *Carter*, we explicitly stated that

> we need not decide the question whether the rule that we announced in *Milam*, supra — which forbids a defendant from attacking as inconsistent a verdict of guilty on one count and not guilty on a different count — is just as applicable in repugnant verdict cases as it is in other inconsistent verdict cases.

Id. at 869. As is evident from the discussion above, *Milam*'s inconsistent verdict rule does not abolish repugnant verdicts altogether. To the extent *Blevins* states otherwise, it is hereby overruled.

We note that *Carter* inaccurately stated that, at the time of that opinion, this Court had not analyzed the concept of repugnant verdicts in relation to this Court's abolition of the "inconsistent verdict" rule. As discussed above, we did, in fact, consider repugnant verdicts in *Turner*, supra, and in *Guajardo*, supra, prior to the time that *Carter* was decided.

controlled by either *Milam*, supra, or *Shepherd v. State*, 280 Ga. 245 (626 SE2d 96) (2006).

(a) *Milam*. In *Milam*, unlike here, there was evidence to support a finding that the defendant's mental state changed during the commission of the charged crimes. More specifically, in *Milam*, the defendant contended that he was suffering from delusions that made him very angry and made him want "to blast away everybody." *Milam*, supra, 255 Ga. at 561. On the day of the crimes,

> [Appellant] went to his father's bedroom and obtained a single-barreled, single-shot shotgun belonging to his father. As [Ben] Cheese exited the bathroom appellant shot him. [Walter] Beasley testified that he opened his bedroom door after hearing the gunshot and walked down a hallway toward Horace Milam's bedroom. Appellant, who was standing inside the bedroom, yelled for Beasley to get back, and Beasley returned to his room. Horace Milam stepped over Cheese and went into his own bedroom, where he was shot by appellant.

Id. at 560. The jury found Milam to be not guilty by reason of insanity for the murder of Cheese and guilty but mentally ill of the murder of Horace Milam. We analyzed the conflicting verdicts as follows:

19

Initially, we note that, although the psychiatrist testified, first, that [Appellant] told him that he had heard voices in the past and that on the day of the killings those voices had made him very angry, and second, that he was of the opinion that appellant was mentally ill, he did not testify that appellant did not know the difference between right and wrong at the time of the crime. Moreover, . . . the state did present evidence of sanity in this case [to rebut the prior finding of insanity]. In this regard the record shows that appellant reloaded the gun after shooting Ben Cheese, and that when he saw Walter Beasley, he merely told Beasley to get back, instead of shooting him. After Beasley retreated, appellant shot and killed Horace Milam when Horace entered the bedroom. From appellant's warning to Beasley, the jury could infer that appellant knew that killing was wrong; that he did not want to kill Beasley; and that the demons he claimed to hear actually did not "make him want to blast away everybody." In addition, appellant's flight from the house is evidence which a rational juror could consider as a factor indicating that appellant knew that his actions were wrong. Finally, the arresting officers testified that appellant was calm and cooperative following his arrest, thus contradicting appellant's testimony that, at the time of the killings, voices were driving him mad and he did not know what he was doing.

Id. In other words, there was evidence that supported the jury's determination that Milam's mental state shifted between the distinct acts of shooting Cheese and shooting Horace Milam, which were separated by Milam's act of reloading the gun he was shooting

and his conscious decision to warn away an intervening person rather than shooting that person as well. This evidence allowed the verdicts in *Milam* to be logically and legally consistent, and, therefore, not repugnant.

In this case, however, McElrath was indicted for stabbing Diane in a single episode. No evidence of a deliberate interval during the stabbing was presented to the jury to support a finding that McElrath's mental state changed at any time as he stabbed Diane.

(b) *Shepherd. Shepherd v. State*, supra, on which the State largely relies, is distinguishable from the present case, at least as to the result of that opinion. In *Shepherd*, the defendant shot and killed his half-sister, and the jury found him not guilty by reason of insanity for malice murder, but found him guilty but mentally ill of felony murder predicated on aggravated assault, felony murder predicated on possession of a firearm by a convicted felon, aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a crime. In sentencing Shepherd, the trial court merged the counts of felony

21

murder predicated upon aggravated assault, aggravated assault, and possession of a firearm by a convicted felon into the felony murder count predicated upon the possession of a firearm by a convicted felon. Id. at 245 n.1.

The defendant contended that these verdicts were mutually exclusive. This Court rejected the defendant's claim, explaining that only two contradictory *guilty* verdicts fall into the category. *Shepherd*, 280 Ga. at 248 (1). We went on to discuss the verdicts as inconsistent, and determined that, despite the fact that the crimes occurred at one time and against the same victim,[17] the rule that inconsistent verdicts require reversal had been abolished by *Milam*.

---

[17] With regard to the circumstances surrounding the murder of his half-sister, Shepherd stated in a police interview that

> his sister "tried to run up behind me [and] . . . assault me" because "I wouldn't have sex with her and her friends"; that she went to the kitchen sink to get a knife with which to attack him; and as she turned toward him, he opened fire striking her at least twice. Shepherd stated that he shot her again in the neck as she was trying to get away; he then pulled her away from the doorway; tossed his pistol in the backyard; and went across the street to call 911. He also disclosed that he had a prior felony conviction for eluding the police. When asked by a detective if he was sorry about the events, Shepherd answered, "No, I think I'm right."

*Shepherd*, supra, 280 Ga. at 246-247.

With this background, we concluded that the inconsistent verdicts in *Shepherd* did not require reversal. Id. at 248-250 (1). We did not, as we do in the present case, consider whether the verdicts were *repugnant*.

As to that unaddressed issue, there was evidence to logically and legally support both a finding that the defendant was not guilty by reason of insanity for malice murder and a finding that the defendant was guilty of the ongoing offense of possession of a firearm by a convicted felon and felony murder predicated on that crime. The defendant had admitted that he knew that, as a convicted felon, he was not allowed to be in possession of the handgun, the felonious possession of which was the proximate cause of the victim's death.[18] See *Shepherd*, supra, 280 Ga. at 250 (2).

The jury's verdicts that the defendant in *Shepherd* was guilty but mentally ill of aggravated assault and felony murder predicated on aggravated assault are more problematic, given our analysis of

---

[18] The defendant purchased the handgun three months before he killed his half-sister.

the similar verdicts in this case. But, even if we should have decided that those verdicts were repugnant with regard to the verdict of not guilty by reason of insanity of malice murder, such that those verdicts should have been vacated, the result in *Shepherd* would have been the same, because the defendant was ultimately convicted and sentenced only on the non-repugnant verdict of guilty but mentally ill of felony murder based on possession of a firearm by a convicted felon. See id. at 245 n.1. To the extent that the analysis in *Shepherd* diverges from our analysis in this case, however, *Shepherd* is disapproved.

4. *The Order Remanding McElrath to the Department of Corrections.*

McElrath argues that the trial court improperly discharged him from a state mental health facility and remanded him to the custody of the Department of Corrections by applying an inappropriate subsection of OCGA § 17-7-131. Specifically, McElrath contends that the trial court should have applied subsections applicable to a defendant found not guilty by reason of insanity rather than guilty but mentally ill. Given our conclusion in

24

Division 2 (c), supra, we need not reach McElrath's argument. Here, McElrath's verdicts are repugnant, and both must be vacated. Therefore, at this juncture, the provisions of OCGA § 17-7-131 are not applicable to McElrath, and the trial court's order considering McElrath's placement under OCGA § 17-7-131 (g) (which relates to the placement of a defendant who has been convicted as guilty but mentally ill) must be vacated.

5. *McElrath's Remaining Contentions.*

McElrath's remaining enumerations all relate specifically to his contention that he was improperly found guilty but mentally ill of and convicted for felony murder based on aggravated assault. Because we conclude that both of McElrath's verdicts must be vacated as repugnant, we need not reach these remaining arguments.

*Judgment vacated and case remanded with direction. All the Justices concur.*

25

DECIDED FEBRUARY 28, 2020.

Murder. Cobb Superior Court. Before Judge Green.

*Kilgore & Rodriguez, H. Maddox Kilgore, Carlos J. Rodriguez*, for appellant.

*Joyette M. Holmes, District Attorney, Amelia G. Pray, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.