**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and WATKINS, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**May 30, 2025**

# In the Court of Appeals of Georgia

A25A0190. JORDAN v. THE STATE.

BARNES, Presiding Judge.

The State of Georgia indicted 35 administrators and teachers employed by the Atlanta Public Schools ("APS"), including Tabeeka Jordan, the Assistant Principal of Deerwood Academy, for conspiracy to violate the Georgia Racketeer Influenced and Corrupt Organizations ("RICO") Act, OCGA § 16-14-1 et seq., and other crimes arising out of their alleged participation in a conspiracy to change students' answers on standardized tests. After several defendants pled guilty, Jordan and 11 other defendants were tried jointly, and following a lengthy trial, the jury found Jordan guilty of conspiracy to violate the RICO Act but not guilty of making false statements and theft by taking. Jordan subsequently filed a motion for new trial, as amended,

which the trial court denied. On appeal from the denial of her motion for new trial, Jordan contends that her acquittal of the predicate offenses of making false statements and theft by taking demonstrated that the jury disbelieved the State's witnesses who testified against her, such that there was insufficient evidence to support her RICO conspiracy conviction. Jordan also contends that she is entitled to a new trial under *Fugitt v. State*, 251 Ga. 451 (307 SE2d 471) (1983), because an alleged accomplice's testimony regarding checkmarks on test answer sheets was shown to be impossible and fabricated. For the reasons discussed more fully below, we reject Jordan's contentions and affirm.

We previously reviewed the voluminous evidence in the APS trial and summarized it as follows:

*APS, Academic Targets, and Adequate Yearly Progress*

Viewed in the light most favorable to the jury's verdict, the record shows that on July 1, 1999, Dr. Beverly Hall became the superintendent of Atlanta Public Schools. . . . [U]nder Dr. Hall, APS was organized into four School Reform Teams ("SRT"), which were specific geographic regions of metropolitan Atlanta and more specifically the elementary and middle schools within those regions. . . .

Immediately after Dr. Hall was hired as superintendent, she began working with professional education consultants to devise a means by which to measure and improve APS students' academic progress. Then, after those consultations, Dr. Hall established a system requiring students at all APS elementary and middle schools to be tested so as to determine the numbers of students who "met academic expectations" and the numbers who "exceeded" such expectations. Importantly, every school in APS was required to meet a "Target" number — i.e., a percentage of students in both of these categories, and Dr. Hall mandated that these Target numbers be raised every year.

In January 2002, around the same time that Dr. Hall began implementing her Targets system for APS, the federal government enacted the No Child Left Behind Act of 2001. Under this legislation, the State of Georgia received federal funding to assist low-income school districts and, inter alia, was required to report whether its schools were making what was termed "Adequate Yearly Progress" ("AYP"), which was measured by students' performance on the annually administered Criterion–Referenced Competency Test ("CRCT"). Schools failing to achieve AYP received additional federal funding to assist teachers and struggling students.

Although inextricably linked, the Targets established by Dr. Hall were separate from the requirements for AYP and, in fact, were more stringent. But in addition to the stated objective of being a means by which to measure students' academic progress during Dr. Hall's tenure,

Targets quickly became the primary means by which to measure teachers and administrators' performance. For instance, the SRT Executive Directors . . . received salary raises if their schools made Targets and AYP, and employees at individual schools would similarly receive bonuses if their schools achieved their Target numbers. Indeed, Dr. Hall's own employment contracts also provided significant salary bonuses that were contingent upon APS achieving its academic progress Targets.

The failure to make Targets, however, often resulted in negative consequences for APS employees. Specifically, teachers and administrators whose students and schools failed to meet Targets could be demoted (resulting in a decreased salary), transferred (also resulting in a decreased salary), or placed on what was termed a Professional Development Plan ("PDP"), which was often a precursor to the termination of one's employment contract with APS. Unsurprisingly, the pressure placed on administrators and teachers to make Targets became intense and was exacerbated by the fact that many at APS believed the Targets to be patently unreasonable. Despite such concerns, Dr. Hall was uncompromising in her stance that Targets be met, informing one principal upon his termination for failing to meet Targets, despite his school's academic progress, that she "had no time for incremental gains."

*Evidence of Cheating Throughout APS*

Within a few years of Dr. Hall's hiring as APS superintendent, large improvements in APS students' test scores led to suspicions that such gains may have been the result of cheating. Initially, little in the way of concrete evidence demonstrated widespread abuses. But in March 2005, a teacher at Parks Middle School informed the Executive Director of SRT–2 that the newly-hired principal was explicitly promoting cheating on the CRCT. And when it appeared that the Director would not be taking any action, the teacher sent anonymous letters directly to Dr. Hall to inform her of what was taking place at the school. Shortly thereafter, the SRT–2 Director attended a staff meeting at Parks Middle School, acknowledged the anonymous letters, but ordered that they cease, stating that the principal had the backing of Dr. Hall and would not be leaving. Nevertheless, APS directed Reginald Dukes, a private investigator who had worked with APS in the past, to investigate the allegations. On June 30, 2006, after interviewing teachers, including the teacher who first reported the issue, Dukes submitted a report to Dr. Hall, in which he concluded that cheating had occurred at Parks Middle School. But Dr. Hall took no action as a result of the report, and APS never hired Dukes again.

In July 2008, a summer re-test of the CRCT for students from several different APS schools was conducted at Deerwood Academy. During that re-test, several teachers collaborated to erase students' incorrect answers and change them to the correct ones, and as a result, Deerwood met its AYP target for that year. A few months later, in

October 2008, Kathleen Mathers became the executive director of the Governor's Office of Student Achievement ("GOSA"), an agency tasked with providing data analysis on various education programs in the State. And in reviewing data related to the CRCT, Mathers noticed abnormally dramatic increases in student achievement within APS, including at Deerwood Academy, in comparison to scores statewide. In addition, her office and the Assessment Division of the Georgia Department of Education were receiving numerous anonymous complaints from parents and teachers of cheating at APS schools. Around this same time, the Atlanta Journal-Constitution ("AJC") published an article regarding the unusual gains in test scores within APS, in which they quoted an expert in the field of psychometrics, who stated that the gains were as "extraordinary as a snowstorm in July" and warranted further investigation.

Based on her own suspicions and the AJC's article, Mathers decided to conduct a statewide erasure analysis on all of the 2008 CRCT summer re-tests. In essence, such an analysis entailed scanning the tests with an Optical Mark Recognition machine that determines if answer bubbles, in addition to the one ultimately filled, also contain residual amounts of pencil graphite, indicating that the bubble had been filled but later erased. The analysis was completed in April 2009, and based on the results, which showed that 11 Deerwood students had significantly high instances of erasing a wrong answer and changing it to a correct one (i.e., wrong-to-right erasures), as well as an additional investigation, GOSA concluded that cheating had occurred at Deerwood Academy during the

2008 summer re-test. Thereafter, Mathers attempted to schedule a meeting with Dr. Hall to discuss the erasure analysis, but after being unable to do so, she had a copy of the report hand-delivered to Dr. Hall at a local conference the superintendent was attending.

On June 23, 2009, Mathers met with APS OIR Director Howard and Penn Payne, an external investigator whom APS hired to look into the cheating allegations, and informed them of GOSA's findings. Following this meeting, on July 6, 2009, Dr. Hall emailed Mathers to inform her that APS and Payne had completed investigations and determined that there was no evidence cheating had occurred at Deerwood Academy. Then, on August 21, 2009, APS released Payne's report regarding Deerwood, which found no evidence of cheating. Ultimately, however, Mathers learned that the statements in Dr. Hall's email and the conclusions in the Payne report were false. In fact, APS had not conducted an internal investigation and, in a draft report that Dr. Hall ordered Few and Howard to destroy, Payne actually concluded that cheating probably occurred at Deerwood during the 2008 summer re-test.

Unsatisfied with APS and Dr. Hall's response to her concerns, in the autumn of 2009, Mathers decided to conduct a statewide erasure analysis for the 2009 CRCT administered the previous spring. The analysis was conducted by CTB/McGraw Hill, and on January 22, 2010, it released its report, which included the number of wrong-to-right erasures in each school in the state (and in each classroom of every

school), and flagged those schools with the highest numbers of wrong-to-right erasures. The report flagged 58 APS schools as having moderate to severe wrong-to-right erasures. Consequently, in February 2010, GOSA ordered APS, as well as other flagged districts, to conduct an internal investigation into the suspected cheating and report its findings by April of that same year. In light of this directive, Dr. Hall assembled a Blue Ribbon Commission ("BRC") to conduct APS's investigation. The BRC then hired KPMG and tasked its investigators with interviewing APS teachers and administrators. But additionally, despite Mathers cautioning APS against questioning the erasure analysis, the BRC hired a private company to conduct another such analysis. And on August 2, 2010, based on the second erasure analysis and KPMG investigators' interviews of APS teachers and administrators, the BRC submitted its report to GOSA, in which it found no evidence of cheating. Unconvinced, Mathers rejected the BRC's findings.

*The Governor's Special Investigation into APS*

Following her rejection of the BRC's report, on August 26, 2010, Mathers requested that Governor Perdue order a special independent investigation into the suspected cheating on the CRCT within APS. Governor Perdue agreed and appointed former Attorney General Michael Bowers, former DeKalb County District Attorney Robert Wilson, and investigator Richard Hyde, with assistance from the Georgia Bureau of Investigation, to investigate the matter. Subsequently, the special investigators went to CBT/McGraw Hill's headquarters in Indianapolis, Indiana, to replicate and, therefore, verify GOSA's

previous erasure analyses of the 2008 and 2009 CRCTs. As a result, the investigators determined that the previous erasure analyses may have even under-reported the numbers of wrong-to-right erasures on those two tests. In addition, from October 2010 through May 2011, the special investigators and GBI agents conducted over 2,100 interviews of APS teachers and administrators employed throughout 55 schools. And despite APS leadership being uncooperative and many teachers lying during interviews, eventually 82 teachers and administrators admitted to cheating during the 2009 CRCT, with many further admitting that such cheating had been occurring at numerous APS schools for years.

On June 30, 2011, the special investigators released their report, concluding that widespread cheating on the 2009 CRCT had occurred within 44 APS schools. Specifically, the special investigators' report found that teachers and administrators had cheated by numerous means, including violating testing security and storage protocols, changing students' answers after the tests were completed, providing students with correct answers while the tests were being administered, and copying the tests and reviewing the correct answers with students prior to the tests being administered. In addition, the special investigators found that testing irregularities were witnessed but not reported as required by testing protocols, and that testing coordinators and administrators signed documents stating that protocols were followed despite being well aware that those averments were not true. The report also found that the reasons provided by teachers and administrators for why they cheated were myriad. Many witnesses explained that if they

made Targets and AYP (which they claimed was difficult to do without cheating), they received bonus money and their schools' achievement would be publicly recognized at APS's annual year-end convocation. But many more witnesses stated that they engaged in cheating or failed to report cheating they witnessed because of APS's culture of obsession with Targets and AYP and of punishing anyone who spoke out with demotions or terminations of employment.

(Footnotes omitted.) *Cotman v. State*, 342 Ga. App. 569, 569-574 (804 SE2d 672) (2017).

*Tabeeka Jordan and Cheating at Deerwood Academy*

Pertinent to the present appeal, the evidence adduced at trial[1] showed that a policy change in 2008 allowed for summer re-tests of the CRCT to count toward a school making AYP for the prior school year. As previously noted, a summer re-test of the CRCT for students from several APS schools took place at Deerwood Academy

---

[1] While the trial transcript does not appear in the appellate record in the present case, the transcript was included in the record for the appeal of two of Jordan's co-defendants. See *Cotman*, 342 Ga. App. 569. In addressing Jordan's contentions, we have taken into account the record from that related appeal. See *Rice v. State*, 354 Ga. App. 103, 106, n. 5 (840 SE2d 508) (2020) (noting that "an appellate court may take judicial notice of the records of other cases before it, in the interest of doing substantial justice and as a means of judicial economy"), citing *Davis v. State*, 287 Ga. 414, 415, n. 1 (696 SE2d 644) (2010).

in July of 2008. Jordan, the Assistant Principal of Deerwood, served as the site administrator monitoring the summer re-test. Deerwood had not made AYP the previous spring, and Jordan, who had been placed on a PDP, felt pressure for the school to meet AYP through the summer re-test.

Lavonia Ferrell and Margaret Merkerson were retired teachers who assisted with the 2008 summer re-test at Deerwood Academy. On the second day of the summer re-test, which covered the math portion of the CRCT, Ferrell was in the school conference room where CRCT test booklets and answer sheets were stored after testing. Jordan entered the room and confided in Ferrell that she was on a PDP and expressed to her that Deerwood needed to make AYP during the summer re-testing. To ensure that the school would make AYP, Jordan requested that Ferrell erase and correct the answers on the math portion of Deerwood fifth-grade students' answer sheets. Ferrell, who had previously worked with Jordan at another elementary school and considered her a friend, agreed to change the answers.

When Merkerson entered the conference room, Ferrell asked her to help make the changes to the answer sheets. Merkerson, who knew Ferrell from working with her at another elementary school, reluctantly agreed to assist in changing the answers after

Ferrell told her that cheating "was being done everywhere" and that nothing would happen to them. Jordan returned to the conference room and reiterated to Ferrell and Merkerson that Deerwood had not made AYP in the spring and that she needed the school to make AYP through the summer re-test. Jordan talked with Ferrell and Merkerson about changing answer sheets; told them that Deerwood needed 21 of its fifth graders to pass the math portion of the CRCT to make AYP; and separated out the answer sheets for those students so that they could be changed. Ferrell then used a testing booklet to create an answer key that they could use for changing the math portion of the answer sheets. Over the next several hours, Ferrell and Merkerson changed the math portion of the answer sheets, and Jordan, who would come and go from the conference room, was present while some of the answer sheets were changed. As a result of the changes to the answer sheets for the summer re-test, Deerwood achieved AYP for the 2007-2008 school year.

The next school year, Ferrell and Merkerson assisted with the spring 2009 CRCT testing at Deerwood Academy. Jordan again asked Ferrell and Merkerson to erase and change test answers so that Deerwood would make AYP, and they again altered students' answer sheets while in the school conference room. As Assistant

Principal, Jordan knew the percentage of students who needed to pass the CRCT for Deerwood to make AYP for the school year, and she provided a document containing this information to Ferrell and Merkerson. Jordan also obtained a list of honor roll students so that Ferrell and Merkerson could use their answer sheets to determine the correct answers. Jordan was in the conference room when Ferrell and Merkerson made some of the changes to the answer sheets and helped calculate the correct answers to some of the math problems. When bonuses were later issued for the 2008-2009 school year, Jordan received a $500 bonus for meeting performance objectives.

Ferrell and Merkerson initially denied to investigators that they had altered any answer sheets, and along with Jordan they tried to prevent any discovery of the cheating. Ultimately, however, Ferrell and Merkerson confessed to what had transpired and were granted immunity from prosecution.

*Procedural Background*

The jury trial of Jordan and her co-defendants for RICO conspiracy and other offenses commenced in August 2014. During the course of the trial, the State, among other things, introduced evidence of the investigations conducted into the cheating at APS and of the statewide erasure analyses of the 2008 CRCT summer re-test and

13

the CRCT spring 2009 test. The State also called numerous witnesses, including 14 of the defendants who pled guilty, who testified to the widespread cheating on CRCT testing by APS administrators and teachers. Additionally, as to the cheating at Deerwood Academy instigated by Jordan, Ferrell and Merkerson testified to events as set out above. At the conclusion of the trial, the jury found Jordan guilty of RICO conspiracy but not guilty of making false statements and theft by taking. The trial court sentenced Jordan as a first offender to five years, with the first two years to be served in confinement and the remainder on probation, and imposed a $5,000 fine and 1,500 hours of community service. The trial court also granted Jordan an appeal bond. Jordan filed a timely motion for new trial in May 2015. She filed an amended motion

for new trial in October 2023,[2] and the trial court denied her motion in January 2024. This appeal followed.

*Legal Analysis*

The standard of review for determining the sufficiency of the evidence to support a criminal conviction is well-established.

> When evaluating a challenge to the sufficiency of the evidence as a matter of federal constitutional due process under *Jackson v. Virginia*, 443 U. S. 307, 318-319 (99 S Ct 2781, 61 LE2d 560) (1979), we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes for which [she] was convicted.

---

[2] The post-trial delay was the result of a dispute over whether the original appellate counsel appointed for Jordan and five other co-defendants should be permitted to withdraw based on an alleged conflict of interest, and whether the trial court's order denying the motion to withdraw was immediately appealable under the collateral order doctrine. See *Buckner-Webb v. State*, 314 Ga. 823, 823-826 (1), 829-832 (2) (b) (878 SE2d 481) (2022) (reciting the procedural history of the parties' dispute over appellate counsel's motion to withdraw based on an alleged conflict of interest and concluding that the trial court's order denying the motion was not subject to immediate appeal under the collateral order doctrine). Ultimately, in March 2023, Jordan obtained new appellate counsel, who then filed the amended motion for new trial on her behalf.

*Copeland v. State*, 314 Ga. 44, 47 (2) (875 SE2d 636) (2022). And in conducting our evaluation, we neither reweigh the evidence nor resolve conflicts in the testimony, as we must defer "to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Harris v. State*, 304 Ga. 276, 278 (1) (818 SE2d 530) (2018).

At the time of the alleged crime,[3] the Georgia RICO Act made it unlawful for "any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Former OCGA § 16-14-4 (a). The Act also made it illegal for "any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." Former OCGA § 16-14-4 (b). Additionally, the Act made it unlawful to conspire to violate the provisions of subsection (a) or (b) of the statute. See Former OCGA § 16-14-4 (c).[4]

---

[3] OCGA § 16-14-4 subsequently was amended in certain respects, effective July 1, 2015. See Ga. L. 2015, p. 693 § 2-25.

[4] Former OCGA § 16-14-4 (c) stated: "It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section."

Under former OCGA § 16-4-3, "'[r]acketeering activity' means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit" any of a list of crimes chargeable by indictment, including crimes of theft and those relating to perjury and other falsifications. See former OCGA § 16-14-3 (9) (A) (ix), (xv).[5] A person participates in a "pattern of racketeering activity" when he or she "engag[es] in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents[.]" Former OCGA § 16-14-3 (8) (A).[6] "And under Georgia law, a person may be found guilty of a RICO conspiracy if they knowingly and willfully join a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts." (Citation and punctuation omitted.) *Cotman*, 342 Ga. App. at 585 (2).

---

[5] These subsections have since been revised and renumbered as OCGA § 16-14-3 (5) (A) (xii), (xxii), and (xxv). See Ga. L. 2015, p. 693 § 2-25 (effective July 1, 2015).

[6] This subsection has since been renumbered as OCGA § 16-14-3 (4) (A). See Ga. L. 2015, p. 693 § 2-25 (effective July 1, 2015); See *Mbigi v. Wells Fargo Home Mtg.*, 336 Ga. App. 316, 323 (2), n. 5 (785 SE2d 8) (2016).

In Count 1 of the indictment, the State charged all of the defendants with violating OCGA § 16-14-4 (c) of the RICO Act in that

> said accused[s] . . . unlawfully conspired and endeavored to acquire and maintain, directly and indirectly, an interest in and control of U. S. Currency, the property of the Atlanta Public School System ("APS") and the Georgia Department of Education ("GaDOE") as further specified below, through a pattern of racketeering activity in violation of OCGA § 16-14-4 (a), and while employed by and associated with APS, unlawfully conspired and endeavored to conduct and participate in, directly and indirectly, APS through a pattern of racketeering activity, in violation of OCGA § 16-14-4 (b), as described below and incorporated by reference as if fully set forth herein; contrary to the laws of said State, the good order, peace and dignity thereof. . . .

Count 1 then set forth multiple alleged acts of racketeering activity associated with senior administrators and with each specific APS school involved in the conspiracy, and it also listed 44 alleged overt acts committed in furtherance of the conspiracy.

As to Deerwood Academy, Count 1 alleged that Jordan "conspired and endeavored to violate the Georgia RICO Act through a pattern of racketeering activity" based on predicate acts of making false statements and writings (OCGA § 16-10-20) and theft by taking (OCGA § 16-8-2). With respect to the predicate acts of making false statements and writings, the indictment alleged that Jordan falsified

18

answer sheets for the 2008 CRCT summer re-test and for the 2009 CRCT spring test at Deerwood and solicited Ferrell and Merkerson to participate in the falsification. With respect to the predicate act of theft by taking, the indictment alleged that Jordan took money belonging to APS by obtaining a bonus check based on the falsified 2009 CRCT spring test results for Deerwood.

We conclude that the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Jordan guilty beyond a reasonable doubt of conspiring to violate the RICO Act as alleged in the indictment. There was ample evidence that "APS administrators and teachers . . . received bonuses and increases in their salaries if Targets and AYP were met and that those goals were often met as a direct result of cheating on the CRCT." *Cotman*, 342 Ga. App. at 586 (2). The evidence also showed that Jordan solicited the help of Ferrell and Merkerson to change Deerwood Academy students' answer sheets for the 2008 CRCT summer re-test and for the 2009 CRCT spring test so that Deerwood could make AYP for the 2007-2008 and 2008-2009 school years, and that Ferrell and Merkerson did as Jordan requested and changed answers on those tests. The evidence further showed that Jordan assisted in the falsification by

identifying to Ferrell and Merkerson the fifth-grade math answer sheets for the 2008 summer re-test that she wanted them to change; by providing Ferrell and Merkerson a list of honor roll students whose tests could be used for determining the correct answers for the 2009 spring test and giving them information about the percentage of students that needed to pass that test; and by helping calculate the correct answers to CRCT math problems. Additionally, there was evidence that Jordan received a $500 bonus based on Deerwood's performance on the CRCT. As in the other appeals where we have addressed the sufficiency of the evidence in the APS cheating case, we conclude that the recited evidence, construed in favor of the verdict, was sufficient to support Jordan's RICO conspiracy conviction. See *Evans v. State*, 360 Ga. App. 596, 597-598 (2) (859 SE2d 593) (2021) (concluding that the evidence was sufficient to support the RICO conspiracy conviction of one of Jordan's co-defendants); *Cotman*, 342 Ga. App. at 586 (2) (concluding that the evidence was sufficient to support the RICO conspiracy convictions of two of Jordan's co-defendants). See also *Jackson*, 443 U. S. at 319 (III) (B); *Brown v. State*, 321 Ga. App. 198, 204 (4) (739 SE2d 118) (2013) (concluding that the evidence that the defendant conspired with other employees to falsify their overtime records in exchange for payment by them was sufficient to

20

support defendant's RICO conviction).[7] "[A]ny conflicts or inconsistencies in the evidence were for the jury to resolve." (Citation and punctuation omitted.) *Evans*, 360 Ga. App. at 598 (2).

Jordan nevertheless contends that the evidence was insufficient to support her RICO conspiracy conviction because she was acquitted of separate counts of making false statements and writings and of theft by taking, which, she maintains, shows that the jury disbelieved Ferrell and Merkerson's account of what transpired. "Any inconsistency, however, does not prove that the evidence was insufficient as a matter of constitutional due process." *Campbell v. State*, 320 Ga. 333, 365 (11), n. 33 (907 SE2d 871) (2024). As our Supreme Court has explained, "an acquittal on one count is not itself a basis to challenge the sufficiency of the evidence as to another count."

---

[7] Based on the evidence presented at trial, Ferrell and Merkerson were Jordan's accomplices, and "[u]nder Georgia statutory law, the testimony of an accomplice must be corroborated to sustain a felony conviction." (Citation and punctuation omitted.) *Copeland*, 314 Ga. at 47 (2). However, while "Georgia law requires independent corroboration of an accomplice's testimony to secure a conviction, federal law does not require such corroboration and, thus, a failure to corroborate accomplice testimony does not offend constitutional due process." (Citation and punctuation omitted.) Id. at 48 (2). In any event, even if the corroboration rule applied to our sufficiency-of-the-evidence analysis, the rule was satisfied in this case because Ferrell and Merkerson corroborated each other's testimony. See *Miller v. State*, 295 Ga. 769, 771 (1) (764 SE2d 135) (2014) (explaining that "accomplices can corroborate each other").

*Howard v. State*, 318 Ga. 681, 684 (1) (899 SE2d 669) (2024). See *McElrath v. State*, 308 Ga. 104, 108-109 (2) (a) (839 SE2d 573) (2020) (noting abolition of rule that inconsistent verdicts warrant reversal). Accordingly, Jordan's argument predicated on the alleged inconsistency in the verdicts is unavailing. See *Harris v. State*, 310 Ga. App. 460, 462 (713 SE2d 665) (2011) (concluding that any alleged inconsistency between the defendant's conviction for conspiracy and his acquittal of the crime constituting the alleged overt act for the conspiracy provided no basis for reversing the defendant's conspiracy conviction); *Smith v. State*, 253 Ga. App. 131, 133-134 (1) (558 SE2d 455) (2001) (holding that alleged inconsistency between the defendant's conviction for conspiracy to traffic drugs and his acquittal on the separate trafficking account provided no basis for reversal, and noting that "criminal defendants may not attack as inconsistent a jury verdict of guilty of one count and not guilty on another count").[8]

---

[8] We also note that the verdicts in this case are not repugnant. "A truly repugnant verdict is rare. Repugnant verdicts occur when, in order to find the defendant not guilty on one count and guilty on another, the jury must make affirmative findings shown on the record that cannot logically or legally exist at the same time." (Citation and punctuation omitted.) *Olushola v. State*, 373 Ga. App. 274, 282 (3) (908 SE2d 249) (2024). That is not the case here, where "[t]he verdict form shows no more than 'guilty' or 'not guilty' as to each count of the indictment [against Jordan], and this Court cannot determine if the jury's verdict reflected inconsistent

Lastly, Jordan maintains that she is entitled to a new trial under *Fugitt*, 251 Ga. 451, because some of Ferrell's testimony was shown to be impossible and fabricated. Specifically, Jordan highlights that Ferrell testified that during the 2008 CRCT summer re-test, Jordan separated out and placed checkmarks on the answer sheets that she wanted changed, but a State witness who was involved in the statewide erasure analysis testified that he did not see any checkmarks on the answer sheets. According to Jordan, the testimony of the State witness shows that Ferrell's testimony regarding checkmarks was fabricated and had to be disregarded.

Jordan's argument is without merit. Under *Fugitt*, a witness's testimony must be disregarded only in the rare circumstance where there is "no doubt" that the testimony "in every material part [was] purest fabrication." *Fugitt*, 251 Ga. at 453 (1). "The type of evidence that proves, beyond any doubt, that trial testimony was false is evidence which removes the issue of the witness' credibility, such as evidence that shows that the witness' trial testimony was physically impossible." (Citation and punctuation omitted.) *State v. Abernathy*, 295 Ga. 816, 819 (1) (764 SE2d 387) (2014). See *Fugitt*, 251 Ga. at 452, 453 (1) (concluding that there was no doubt that the

factual conclusions, lenity, compromise, or legal error." (Footnotes omitted.) *Harris*, 310 Ga. App. at 462.

23

witness's testimony had been fabricated and had to be disregarded, given that the witness was incarcerated at the time that he claimed to have seen the events implicating the defendant in the crime). But no such evidence was presented in this case. "[T]he presentation of conflicting evidence alone does not support a showing" that a witness's testimony was pure fabrication. *Greene v. State*, 303 Ga. 184, 188 (3) (811 SE2d 333) (2018). And, here, there was at most simply an inconsistency between Ferrell's testimony and the State witness's testimony on the single issue of whether checkmarks were placed on the answer sheets for the 2008 CRCT summer re-test. Moreover, the jury could have found that there ultimately was no inconsistency, as the jury could have concluded that the State witness did not see any checkmarks because the marks had been thoroughly erased by Ferrell and Merkerson when changing the answer sheets. As Ferrell testified, she and Merkerson tried to erase "really, really well." Under these circumstances, "the weight and credit to be afforded [Ferrell's] testimony was a matter for the jury to determine." *Jones v. State*, 265 Ga. 84, 85 (2) (453 SE2d 716) (1995). See *Greene*, 303 Ga. at 187-188 (3) (noting that inconsistencies in the evidence do not render a trial fundamentally unfair and are a matter for jury resolution).

For the foregoing reasons, the trial court did not err in denying Jordan's motion for a new trial. We therefore affirm the judgment.

*Judgment affirmed. Brown and Watkins, JJ., concur.*